# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued October 22, 2012　　　　Decided June 28, 2013

No. 12-5031

ROBERT GORDON,
APPELLEE

v.

ERIC H. HOLDER, JR., IN HIS OFFICIAL CAPACITY AS ATTORNEY
GENERAL OF THE UNITED STATES, ET AL.,
APPELLANTS

―――――

Consolidated with 12-5051

―――――

Appeals from the United States District Court
for the District of Columbia
(No. 1:10-cv-01092)

―――――

*Michael P. Abate*, Attorney, U.S. Department of Justice, argued the cause for appellants/cross-appellees. With him on the briefs were *Stuart F. Delery*, Acting Assistant Attorney General, *Ronald C. Machen Jr.*, U.S. Attorney, and *Alisa B. Klein* and *Mark B. Stern*, Attorneys. *Gerald C. Kell*, Special Trial Counsel, U.S. Department of Justice, entered an appearance.

2

*Eric T. Schneiderman*, Attorney General, Office of the Attorney General for the State of New York, *Barbara D. Underwood*, Solicitor General, *Steven Wu*, Special Counsel to the Solicitor General, *Irvin B. Nathan*, Attorney General, Office of the Attorney General for District of Columbia, *Samuel S. Olens*, Attorney General, Office of the Attorney General for the State of Georgia, *David M. Louie*, Attorney General, Office of the Attorney General for the State of Hawai'i, *Lawrence G. Wasden*, Attorney General, Office of the Attorney General for the State of Idaho, *Lisa Madigan*, Attorney General, Office of the Attorney General for the State of Illinois, *Gregory F. Zoeller*, Attorney General, Office of the Attorney General for the State of Indiana, *Michael C. Geraghty*, Attorney General, Office of the Attorney General for the State of Alaska, *Tom Horne*, Attorney General, Office of the Attorney General for the State of Arizona, *Dustin McDaniel*, Attorney General, Office of the Attorney General for the State of Arkansas, *Kamala D. Harris,* Attorney General, Office of the Attorney General for the State of California, *John W. Suthers*, Attorney General, Office of the Attorney General for the State of Colorado, *George Jepsen*, Attorney General, Office of the Attorney General for the State of Connecticut, *Joseph R. Biden III*, Attorney General, Office of the Attorney General for the State of Delaware, *Lori Swanson*, Attorney General, Office of the Attorney for the State of Minnesota, *Jim Hood*, Attorney General, Office of the Attorney General for the State of Mississippi, *Jon Bruning*, Attorney General, Office of the Attorney General for the State of Nebraska, *Catherine Cortez Masto*, Attorney General, Office of the Attorney General for the State of Nevada, *Michael A. Delaney*, Attorney General, Office of the Attorney General for the State of New Hampshire, *Gary K. King*, Attorney General, Office of the Attorney General for the State of New Mexico, *Roy Cooper*, Attorney General, Office of the Attorney General for the State of North Carolina, *Tom Miller*,

Attorney General, Office of the Attorney General for the State of Iowa, *Derek Schmidt*, Attorney General, Office of the Attorney General for the State of Kansas, *Jack Conway*, Attorney General, Office of the Attorney General for the Commonwealth of Kentucky, *William J. Schneider*, Attorney General, Office of the Attorney General for the State of Maine, *Douglas F. Gansler*, Attorney General, Office of the Attorney General for the State of Maryland, *Martha Coakley*, Attorney General, Office of the Attorney General for the Commonwealth of Massachusetts, *Bill Schuette*, Attorney General, Office of the Attorney General for the State of Michigan, *Robert E. Cooper*, Attorney General, Office of the Attorney General for the State of Tennessee, *Mark L. Shurtleff*, Attorney General, Office of the Attorney General for the State of Utah, *William H. Sorrell*, Attorney General, Office for the Attorney General for the State of Vermont, *Robert M. McKenna*, Attorney General, Office for the Attorney General for the State of Washington, *Darrell V. McGraw, Jr.*, Attorney General, Office of the Attorney General for the State of West Virginia, *Gregory A. Phillips*, Attorney General, Office of the Attorney General for the State of Wyoming, *Wayne Stenehjem,* Attorney General, Office of the Attorney General for the State of North Dakota, *Michael DeWine*, Attorney General, Office of the Attorney General for the State of Ohio, *E. Scott Pruitt*, Attorney General, Office of the Attorney General for the State of Oklahoma, *Linda L. Kelly*, Attorney General, Office of the Attorney General for the Commonwealth of Pennsylvania, *Peter F. Kilmartin*, Attorney General, Office of the Attorney General for the State of Rhode Island, *Alan Wilson*, Attorney General, Office of the Attorney General for the State of South Carolina, and *Marty J. Jackley*, Attorney General, Office of the Attorney General for the State of South Dakota, were on the brief for *amici curiae* States of New York, et al. in support of appellants/cross-appellees.

*Allison M. Zieve* and *Greg A. Beck* were on the brief for *amici curiae* Campaign for Tobacco-Free Kids, et al. in support of appellants/cross-appellees.

*Linda Singer* was on the brief for *amicus curiae* City of New York in support of appellants/cross-appellees.

*Scott A. Sinder* was on the brief for *amicus curiae* National Association of Convenience Stores, et al. in support of appellants/cross-appellees.

*Aaron M. Streett* argued the cause for appellee/cross-appellant . With him on the briefs were *R. Stan Mortenson* and *Sara E. Kropf*. *Richard P. Sobiecki* entered an appearance.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the court filed by *Circuit Judge* GRIFFITH.

Opinion concurring in the judgment in part and dissenting in part filed by *Circuit Judge* KAVANAUGH.

Opinion concurring in part and concurring in the judgment filed by *Senior Circuit Judge* SENTELLE.

GRIFFITH, *Circuit Judge*: Robert Gordon owns a business that sold tobacco products across state lines. In the district court, Gordon sought a preliminary injunction against the enforcement of provisions of the Prevent All Cigarette Trafficking Act (PACT Act) that require him to pay state and local taxes and ban him from sending his products through the U.S. mail. Gordon argues that the tax provisions violate the Due Process Clause and the Tenth Amendment and that the

mail ban runs afoul of the Due Process and Equal Protection Clauses.

The district court enjoined the enforcement of the tax provisions on due process grounds, but otherwise dismissed Gordon's claims. The government appeals the preliminary injunction, and Gordon cross-appeals the district court's dismissal of, and refusal to grant a preliminary injunction for, his remaining claims. For the reasons set forth below, we affirm the district court's decision in its entirety.

I

A

In most states, the liability for sales and use taxes falls primarily on the buyer. U.S. Government Accountability Office, GAO-03-714T, Internet Cigarette Sales: Limited Compliance and Enforcement of the Jenkins Act Result in Loss of State Tax Revenue 3 (2003) (hereinafter GAO Report); WALTER HELLERSTEIN, STATE TAXATION ¶ 12.01 (3d ed. 2012). States require retailers to collect applicable taxes from resident buyers and remit the receipts to the state. STEVEN MAGUIRE, CONGRESSIONAL RESEARCH SERV., STATE TAXATION OF INTERNET TRANSACTIONS 1 (2013). A state may not, however, impose such an obligation on a retailer with whom the state lacks minimum contacts. *See Quill Corp. v. North Dakota*, 504 U.S. 298 (1992).[1] This means that most

---

[1] The minimum contacts requirement derives from the Due Process Clause. The Due Process Clause is not the only provision of the Constitution that limits states' authority to tax: the so-called Dormant Commerce Clause prohibits states from requiring retailers with whom the state lacks a "substantial nexus" to collect taxes, absent congressional authorization. *Quill*, 504 U.S. at 311. The

out-of-state retailers operate beyond the state's regulatory reach. When they cannot rely on retailers to collect taxes, states find it both expensive and difficult to track the smaller out-of-state purchases of their residents and to collect the applicable taxes directly from them. This creates an opportunity for tax evasion that is especially costly when it comes to goods like tobacco products that are taxed at high rates. GAO Report, *supra*, at 7. In an effort to eliminate this opportunity for tobacco buyers, Congress passed the Jenkins Act, which obligates retailers to report each interstate sale of tobacco products to the tax authority of the consumer's state. Pub. L. No. 81-363, 63 Stat. 884 (1949).

More than a half century has elapsed since the passage of the Jenkins Act, and as the Internet has made it easier for consumers to order tobacco products from out-of-state sellers, it has become more difficult for states and localities to collect taxes on these transactions. H.R. Rep. No. 111-117, at 18-19 (2009); *see also* GAO Report, *supra*, at 8, 12-13. Remote purchasing also makes it easier for parties to evade age restrictions and otherwise traffic in cigarettes illegally. 15 U.S.C. § 375 note; *see also* H.R. Rep. No. 111-117, at 18.

Dormant Commerce Clause "nexus" test may be more demanding than the Due Process Clause "minimum contacts" test, *see id.* at 313, 317-18, but it is not at issue in this case because Gordon challenges a federal statute.

My concurring colleague criticizes this footnote as "gratuitous." *Post*, at 1 (Sentelle, J., concurring). I disclaim any attempt to opine on the effect of the Dormant Commerce Clause, which, as my colleague correctly points out, is not at issue in this case. I include this incontrovertible description of the Supreme Court's Dormant Commerce Clause doctrine only to clarify that the Due Process Clause is not the only provision that restricts a state's power to tax out-of-state retailers.

Finding the Jenkins Act inadequate, H.R. Rep. No. 111-117, at 18, Congress has sent the PACT Act into the breach.

The PACT Act is "aimed primarily at combating three evils: tobacco sales to minors, [illicit] cigarette trafficking, and circumvention of state taxation requirements." *Gordon v. Holder* (*Gordon I*), 632 F.3d 722, 723 (D.C. Cir. 2011). It does so by restricting "delivery sales" of cigarettes and smokeless tobacco products. A delivery sale is any sale in which either the purchase or the delivery does not occur face-to-face. 15 U.S.C. § 375(5). Two sections of the Act are at issue here. Section 2a prohibits delivery sales unless all applicable state and local taxes are paid "in advance of the sale, delivery, or tender." 15 U.S.C. § 376a(a)(3)-(4), (d). Delivery sellers must comply with "all State, local, tribal, and other laws generally applicable to sales of cigarettes or smokeless tobacco as if the delivery sales occurred entirely within the specific State," meaning that they must collect any taxes that state or local laws require in-state retailers to collect. 15 U.S.C. § 376a(a)(3). They are subject to federal criminal and civil penalties if the applicable taxes have not been paid in advance. 15 U.S.C. § 376a(d)(1) (prohibition); 15 U.S.C. § 377 (penalties). Section 3 prohibits sending tobacco products in the U.S. mail. 18 U.S.C. § 1716E. As a result, tobacco delivery sellers must resort to private carriers.

B

According to his complaint, Robert Gordon ran a business selling tobacco products in the Alleghany Territory of the Seneca Nation of Indians, located in western New York. After starting his business in 2002, Gordon accepted orders in person, over the phone, and occasionally online. At the height of his business, Gordon took in two million dollars in revenue every month. Ninety-five percent of that revenue came from

sales to customers outside of New York. Gordon claims, however, that he has never made a sale into some state and local taxing jurisdictions within the United States. *See* Marcia Gordon Second Decl. ¶ 13.

Gordon asserts that his business has suffered under the PACT Act. Until recently, Gordon has enjoyed the protection of a Western District of New York preliminary injunction against the enforcement of the tax provisions,[2] but the mail ban has taken its toll. The major private carriers – Federal Express, United Parcel Service, and DHL – also refuse to deliver tobacco products, leaving Gordon with only more expensive couriers. On May 30, 2013, while this appeal was pending, Gordon notified the court that he has found it necessary to close his business.

C

Gordon's case has been before us already. *Gordon v. Holder* (*Gordon I*), 632 F.3d 722 (D.C. Cir. 2011). On June 28, 2010, the day before the PACT Act took effect, Gordon filed a complaint alleging that the tax provisions and the mail ban are unconstitutional and sought a preliminary injunction against

---

[2] A group of plaintiffs brought a similar challenge to the PACT Act in the Western District of New York, and that district court granted a preliminary injunction against enforcement of the tax provisions on due process grounds. *See Red Earth LLC v. United States*, 728 F. Supp. 2d 238 (W.D.N.Y. 2010). The Second Circuit upheld the preliminary injunction. *Red Earth LLC v. United States*, 657 F.3d 138 (2d Cir. 2011) (per curiam). On June 7, 2013, the parties voluntarily stipulated to dismissal with prejudice, and the court vacated the injunction. *See* Stipulation and Order of Dismissal, *Red Earth LLC v. United States*, No. 10-CV-530 (W.D.N.Y. June 7, 2013).

their enforcement. *Id.* at 723. The district court denied Gordon's motion the next day on the sole ground that it was too late to stop the Act from taking effect. *Id.* at 724. Gordon appealed.

We remanded Gordon's motion to the district court to consider the factors a plaintiff must demonstrate to obtain a preliminary injunction. *Gordon I*, 632 F.3d at 726. On remand, the district court enjoined the tax provisions on due process grounds, but dismissed for failure to state a claim Gordon's Tenth Amendment challenge to the tax provisions and his due process and equal protection challenge to the mail ban. *See Gordon v. Holder*, 826 F. Supp. 2d 279 (D.D.C. 2011). Both parties appealed.

We have jurisdiction to review the resolution of Gordon's motion for a preliminary injunction under 28 U.S.C. § 1292(a)(1), and the dismissal of his claims under 28 U.S.C. § 1291. The closure of Gordon's business has not mooted his appeal. His wife submitted a sworn declaration that she and Gordon intend to reopen their business if they prevail, and that they remain capable of doing so. Marcia Gordon Third Decl. ¶¶ 5-7. Gordon's "uncontroverted intention to operate in the future in ways that would violate" the PACT Act "keeps the controversy alive." *See Unity08 v. FEC*, 596 F.3d 861, 864 (D.C. Cir. 2010).[3]

---

[3] Because we are required to ascertain our jurisdiction before proceeding to the merits of an appeal, *see Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998), our conclusion that the closure of Gordon's business does not moot this case is final. Naturally, facts may develop that moot the case in the future, at which point the district court would be required to dismiss Gordon's complaint. But the district court is not, as our concurring colleague seems to suggest,

10

II

As we explained in *Gordon I*, "'[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest.'" 632 F.3d at 724 (quoting *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008)). We review the "district court's weighing of the four preliminary injunction factors and its ultimate decision to issue or deny such relief for abuse of discretion." *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). We review the district court's legal conclusions de novo and its findings of fact for clear error. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012). But, as the Supreme Court admonished in *Ashcroft v. ACLU*, where "the underlying constitutional question is close" we must "uphold the injunction and remand for trial on the merits." 542 U.S. 656, 664-65 (2004); *see also Red Earth LLC v. United States*, 657 F.3d 138, 145 (2d Cir. 2011) (per curiam) ("Because the district court reached a reasonable conclusion on a close question of law, there is no need for us to decide the merits at this preliminary stage."). Under *Ashcroft*, if the district court's analysis of the preliminary injunction factors reflects a reasonable conclusion about a close question of constitutional law, and contains no other legal error, then we must send the case back to the district court with the preliminary injunction intact. We must refrain from resolving novel and difficult constitutional questions, leaving them to be

*post*, at 1 (Sentelle, J., concurring), free to revisit our holding that the case is *currently* an Article III case or controversy.

settled at a later stage, with the benefit of further factual and legal development.

The government and dissent argue that *Ashcroft*'s gloss on the standard of review applies only to preliminary injunctions based on the First Amendment, when the government bears a special burden to justify the challenged law with a compelling governmental interest. Appellants' Reply Br. 16 n.9 (citing *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429-30 (2006)). We disagree. The *Ashcroft* Court expressly derived its deferential approach "from established standards of appellate review" set out in *Walters v. National Association of Radiation Survivors* – a case involving a preliminary injunction based, like the one here, on the Due Process Clause. *Ashcroft*, 542 U.S. at 664 (quoting *Walters*, 473 U.S. 305, 336 (1985) (O'Connor, J., concurring)). Our sister circuits have also applied *Ashcroft*'s standard of review to preliminary injunctions based on due process challenges. *See Red Earth*, 657 F.3d at 145 (applying *Ashcroft* to an identical due process challenge to the PACT Act); *Reproductive Health Serv. of Planned Parenthood of St. Louis Region v. Nixon*, 428 F.3d 1139, 1145 (8th Cir. 2005) (applying *Ashcroft* to a constitutional challenge to an abortion regulation). In fact, we find no case expressly limiting *Ashcroft*'s command to First Amendment challenges. To be sure, *Ashcroft* was a First Amendment case, and certain features of the Court's analysis naturally have no bearing outside the First Amendment context. For example, the Court affirmed the district court's conclusion that the plaintiff was likely to succeed on the merits because the government had not met its special First Amendment burden to justify the challenged restrictions on speech with a compelling governmental interest. *See Gonzales*, 546 U.S. at 429 (describing *Ashcroft*). But the *Ashcroft* Court's description of our standard of review is not so restricted. It reflects the

general principle that, even though Congress has provided for interlocutory review of preliminary injunctions, premature resolution of difficult constitutional questions is undesirable. *Cf. Pearson v. Callahan*, 555 U.S. 223, 239 (2009) (describing the dangers of premature resolution of constitutional questions); *Mitchell v. Forsyth*, 472 U.S. 511, 549-50 (1985) (Brennan, J., dissenting) ("[R]esolution of even the most abstract legal disputes is advanced by the presence of a concrete set of facts."). Thus, the Court's command to uphold the injunction when "the underlying constitutional question is close" binds us today.

We conclude that the district court did not abuse its discretion by entering a preliminary injunction.

A

We begin with the district court's assessment of Gordon's likelihood of success on the merits, which is left untouched by the closure of Gordon's business. The district court held that Gordon is likely to succeed on the merits of his due process challenge. *Gordon*, 826 F. Supp. 2d at 293. Because we find the underlying constitutional questions to be close, we affirm the district court's conclusion. *See Ashcroft*, 542 U.S. at 664-65.[4]

---

[4] For this reason, contrary to my concurring colleague's statement, Part II.A "elevat[es]" nothing "to circuit law." *Post*, at 1 (Sentelle, J., concurring). The legal premises of Gordon's due process challenge remain fair game on remand; we merely conclude that the questions they raise are too close to call at this stage. *See Sherley v. Sebelius*, 689 F.3d 776, 781 (D.C. Cir. 2012) ("[T]he decision of a trial or appellate court whether to grant or deny a preliminary injunction does not constitute law of the case for the purpose of further proceedings and does not limit or preclude the parties from litigating the merits." (citation omitted)).

Gordon argues that the PACT Act "violates nonresident tobacco retailers' due process rights . . . by subjecting them to taxes in state and local forums without regard to whether they have minimum contacts with the taxing jurisdiction." [5] Appellee's Br. 21. This argument presents two substantial and novel constitutional questions. First, does the Due Process Clause require minimum contacts between the state or local taxing authority and the nonresident seller even when the federal government is the source of the seller's duty to collect taxes? And second, if due process requires minimum contacts with the state or local taxing jurisdiction, does a single delivery sale to a buyer in that jurisdiction create minimum contacts? Both are questions of law, but they are matters of first impression, and their resolution would benefit from fuller factual development below. *See Pearson*, 555 U.S. at 239. We do not settle them here because we need not do so to affirm the preliminary injunction.

1

Although it is well-settled that the Due Process Clause requires minimum contacts between the taxing sovereign and the taxed entity, *see Miller Bros. Co. v. Maryland*, 347 U.S. 340, 342, 344-45 (1954), this appeal presents a unique twist on that principle: with which sovereign must the taxed entity possess minimum contacts when there is one sovereign that defines and benefits from the tax obligation (in this case, the state or local government), and another that imposes and

---

[5] As discussed above, Gordon is formally "collecting" taxes owed by the buyer and remitting them to the state, rather than paying them. Under the Due Process Clause, we treat an obligation to collect taxes the same as an obligation to pay taxes. *See Quill*, 504 U.S. at 319 (Scalia, J., concurring) (collecting cases).

enforces the obligation (in this case, the federal government)? Gordon and the government think that the question can be resolved by reference to precedent. We do not. This question is novel and close, and we cannot say that the district court's conclusion that Gordon is likely to succeed on the merits is an abuse of discretion. We are therefore bound to affirm its determination. *See Ashcroft*, 542 U.S. at 664-65.

For its part, the government argues that the Act is constitutional because Gordon has minimum contacts with the federal government, the sovereign that imposed and will enforce his tax obligations. The government correctly points out that this is not the first time a seller has challenged Congress's power to oblige participants in interstate commerce to comply with state-defined duties. The Supreme Court has twice upheld federal laws against similar challenges – one to the Ashurst-Sumners Act and one to the Webb-Kenyon Act. *See Ky. Whip & Collar Co. v. Ill. Cent. Ry. Co.*, 299 U.S. 334 (1937); *James Clark Distilling Co. v. W. Maryland Ry. Co.*, 242 U.S. 311 (1917). The Ashurst-Sumners Act made "it unlawful knowingly to transport in interstate or foreign commerce goods made by convict labor into any State where the goods are intended to be received, possessed, sold, or used in violation of its laws." *Kentucky Whip & Collar Co.*, 299 U.S. at 343. The Webb-Kenyon Act prohibited "the transportation in interstate commerce of all liquor 'intended . . . to be received, possessed, sold, or in any manner used . . . in violation of any law of'" the destination state. *James Clark Distilling Co.*, 242 U.S. at 321. In both cases, the Supreme Court deemed it irrelevant that the states defined the companies' legal duties because the "will" behind the two laws was Congress's, not the states'. *Ky. Whip & Collar Co.*, 299 U.S. at 347-52; *James Clark Distilling Co.*, 242 U.S. at 326. The "will" behind the PACT Act is also Congress's, so the government argues that these precedents require us to

disregard the role the states play in defining Gordon's legal duties. Appellants' Br. 25, 27; *see also Musser's Inc. v. United States*, No. 10-4355, 2011 WL 4467784, *5 (E.D. Pa. Sept. 26, 2011) ("[T]he Act's tax-payment requirement is not being imposed by a state, acting unilaterally, but by Congress, and the legislative due process analysis must reflect the federal character of the legislation."). Because Congress's "will" converts the state taxes into federal duties, the argument goes, the Due Process Clause demands minimum contacts only between Gordon and the federal government.

The government's argument overlooks an important distinction: The challenges to the federal statutes at issue in *James Clark Distilling Company* and *Kentucky Whip & Collar Company* were brought under the Commerce Clause; unlike Gordon's challenge, they raised no issue of minimum contacts under the Due Process Clause.[6] *See James Clark Distilling*

---

[6] The parties in those cases raised due process challenges, but not of the sort we consider here. *See James Clark Distilling Co.*, 242 U.S. at 320 ("That government can, consistently with the due process clause, forbid the manufacture and sale of liquor and regulate its traffic, is not open to controversy . . . ."); *id.* at 332 ("It is only necessary to point out that the considerations which we have stated dispose of all contentions that the Webb-Kenyon Act is repugnant to the due process clause of the Fifth Amendment, since what we have said concerning that clause in the Fourteenth Amendment as applied to state power is decisive."); *Ky. Whip & Collar Co.*, 299 U.S. at 352 ("In the congressional action there is nothing arbitrary or capricious bringing the statute into collision with the requirements of due process of law.").

The government and the dissent, *post*, at 2-3 (Kavanaugh, J., dissenting), identify several other federal statutes that subject out-of-state sellers to state regulation. These statutes likewise have never been scrutinized under the Due Process Clause. The one

*Co.*, 242 U.S. at 326; *Ky. Whip & Collar Co.*, 299 U.S. at 348. "As the Supreme Court has explained, the inquiries are analytically distinct and should not be treated as if they were synonymous." *Gordon I*, 632 F.3d at 725 (citation omitted). Congress's "will" was enough to cure any *Commerce* Clause defect in the Ashurst-Sumners and Webb-Kenyon Acts because Congress may authorize states to regulate interstate commerce. *Id.* But a medicine that cures one ailment may be feckless against the next. No doctor would prescribe penicillin for a broken arm; nor will we uncritically hand out the Supreme Court's Commerce Clause prescription when a litigant comes to us complaining of a due process injury. Congress's "will" *might* cure the due process injury that would otherwise arise if the states tried unilaterally to impose taxes on Gordon. But to reach that conclusion, we must conduct a closer

---

exception is the Jenkins Act, which a three judge district court once upheld against a due process challenge. *See Consumer Mail Order Ass'n of Am. v. McGrath*, 94 F. Supp. 705 (D.D.C. 1950). But that Act is distinguishable because the federal government imposed, defined, and enforced the duty, rather than incorporating a duty created by state law. *See* 15 U.S.C. § 376 (setting out detailed requirements for the report the seller must submit to the state).

All of these federal laws are distinguishable from the PACT Act for an additional reason: the state laws they incorporate do not impose a duty to collect taxes; they regulate commercial activity instead. The Court has long held that mere contact through the U.S. mail provides the "minimum contact" required for a state to assert *regulatory*, as distinguished from taxation, jurisdiction. *See Travelers Health Ass'n v. Virginia ex rel. State Corp. Comm'n*, 339 U.S. 643, 646-50 (1950). For that reason, the laws cited by the government and the dissent arguably satisfy the Due Process Clause even if Gordon is correct that the Clause requires minimum contacts between the seller and the state or locality.

examination of "the Due Process principles of fair play and substantial justice." *Id.* (internal quotation marks omitted).

Sensitive to the distinctions between the Due Process and Commerce Clauses, Gordon argues that the answer to this question is found in the principles set out in *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992). In *Quill*, an out-of-state mail-order catalogue business challenged a *state* law that compelled "every person who engages in regular or systematic solicitation of a consumer market in" North Dakota to collect use taxes from its customers and remit them to the state. *Id.* at 302-03 (internal quotation marks omitted). Even though Quill was a Delaware corporation with no physical presence in North Dakota, the state statute required the company to collect North Dakota use taxes because it engaged in "regular or systematic solicitation" in the state, as defined by the statute. *Id.* (internal quotation marks omitted). Quill challenged the law under the Due Process and Commerce Clauses. *Id.* at 303-04. Before addressing these separate challenges, the Court discussed the differences between the clauses as they relate to the state's power to regulate an entity located in another state. *Id.* at 305-06. In dicta, the Court explained: "While Congress . . . may authorize state actions that burden interstate commerce, it does not similarly have the power to authorize violations of the Due Process Clause." *Id*. at 305 (internal citations omitted). Then, the Court set out the fundamental rule that the Due Process Clause requires minimum contacts between the taxing sovereign and the taxed entity. *Id.* at 306. Taken together, Gordon argues, the legal principles set forth in *Quill* prohibit Congress from imposing state or local taxes on out-of-state sellers who lack minimum contacts with the state or locality.

Even the government concedes that, after *Quill*, Congress may not *authorize* a state to impose the duty to collect state use taxes on delivery sellers lacking minimum contacts with the

state. But that is not what the PACT Act does. Section 2a does not address itself to states at all. Rather than *authorizing the states* to impose on Gordon a *state* duty to collect state taxes, the PACT Act *imposes on Gordon* a *federal* duty to collect state taxes. States would enforce their own taxes if Congress merely authorized them to tax, whereas they must rely on the federal government to do so under the PACT Act. Because this distinction may make all the difference under the Due Process Clause, the precedent on which Gordon relies does not resolve our constitutional question.

Finding no conclusive precedent, we turn to first principles and there find support for Gordon's argument that due process requires minimum contacts with the state or local government that defines the tax.[7] At its most basic level, "[t]he

---

[7] My concurring colleague asserts that no court has "undertaken th[is] search before affirming the legitimacy of a tax." *Post*, at 1 (Sentelle, J., concurring). We need look no further than *Quill* to find an example of the Supreme Court returning to first principles to understand what type of "minimum contacts" serve to legitimate a state tax. *See, e.g.*, *Quill*, 504 U.S. at 312 (comparing the principles that animate the Due Process Clause with those that animate the Dormant Commerce Clause); *see also New York ex rel. Cohn v. Graves*, 300 U.S. 308, 312-13 (1937); *Pollock v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 555-57 (1895), *overruled by* U.S. CONST. amend. XVI. It seems to me that this approach is to be encouraged when we are asked to apply existing law to novel cases. *See, e.g.*, *FCC v. Fox TV Stations, Inc.*, 556 U.S. 502, 531-32 (2009) (Thomas, J., concurring) (criticizing the Court for not "looking to first principles to evaluate the constitutional question" when faced with novel fact patterns); *Morse v. Frederick*, 551 U.S. 393, 421 (2007) (Thomas, J., concurring) (criticizing the Court for tinkering with constitutional doctrines without "returning to first principles"); *United States v. Lopez*, 514 U.S. 549, 552 (1995) (looking to the first principles of our structure of government to determine the legitimacy

Due Process Clause protects an individual's right to be deprived of life, liberty, or property only by the exercise of lawful power." *J. McIntyre Mach., Ltd. v. Nicastro*, __ U.S. __, 131 S. Ct. 2780, 2789 (2011) (plurality opinion) (citations omitted). When it comes to the power to tax, the elements of "lawful power" are (1) "some definite link, some minimum connection, between a state and the person, property or transaction it seeks to tax," and (2) a rational relationship between "the income attributed to the State for tax purposes" and "values connected with the taxing state." *Quill*, 504 U.S. at 306 (internal quotation marks omitted).

i

We demand "minimum connections" because a taxation regime that does not rest on "minimum connections" lacks democratic legitimacy. *See Quill*, 504 U.S. at 312 ("[T]he due process nexus analysis requires that we ask whether an individual's connections with a State are substantial enough to legitimate the State's exercise of power over him."). The government would have us ignore the role of state and local governments in subjecting Gordon to their own tax laws, but it seems to me that the powers the states wield as a result of the PACT Act implicate the democratic principles that undergird the Due Process Clause.[8]

---

of Congress's novel exercise of its commerce power); *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 299 (1978) (Powell, J.) ("In expounding the Constitution, the Court's role is to discern principles sufficiently absolute to give them roots throughout the community and continuity over significant periods of time, and to lift them above the level of the pragmatic political judgments of a particular time and place." (internal quotation marks omitted)).

[8] By examining these principles, I am emphatically *not* announcing a new test. *See post*, at 1 (Sentelle, J., concurring). I am

The demand that taxation regimes possess democratic legitimacy finds deep roots in the founding of our republic. *See* THE DECLARATION OF INDEPENDENCE para. 15 (U.S. 1776) ("He has combined with others to subject us to a jurisdiction foreign to our constitution, and unacknowledged by our laws; giving his Assent to their Acts of pretended Legislation: . . . For imposing Taxes on us without our Consent . . . ."); EDMUND BURKE, THE POLITICAL TRACTS AND SPEECHES OF EDMUND BURKE, ESQ. 100 (1777) ("[I]n prudence we ought not to be quite so ready with our taxes, until we can secure the desired representation in parliament."); Speech of Lord Camden on the American Declaratory Bill (1766), *in* 16 THE PARLIAMENTARY HISTORY OF ENGLAND, FROM THE EARLIEST PERIOD TO THE YEAR 1803 (T. Hansard ed., 1813) ("[T]he British Parliament have no right to tax the Americans. . . . [T]axation and representation are inseparable – this position is founded on the laws of nature; . . . for whatever is a man's own, is absolutely his own; no man has a right to take it from him without his consent, either expressed by himself or representative . . . ."); *see also Pollack v. Farmers' Loan & Trust Co.*, 157 U.S. 429, 556 (1895) ("The men who framed and adopted [the Constitution] had just emerged from the struggle for independence whose rallying cry had been that 'taxation and representation go together.' . . . The principle was that the consent to those who were expected to pay it was essential to the validity of any tax."); *Slaughter-House Cases*, 83 U.S. 36, 115 (1873) (Bradley, J., dissenting) ("A violation

---

only looking for guidance about how to apply the old one. Our precedent tells us to look for minimum contacts. But with which sovereign? Never before have there been two potential answers to this question, as there are in this case. As I have weighed the answers, it has been helpful to me to understand *why* we require minimum contacts to begin with.

of . . . the principle that recognizes the property of the people as their own, and which, therefore, regards all taxes for the support of government as gifts of the people through their representatives, and regards taxation without representation as subversive of free government, was the origin of our own revolution."). Our due process jurisprudence ensures democratic legitimacy by relying on the mechanism of "fair warning." *See Quill*, 504 U.S. at 312. In *Quill*, the Supreme Court reasoned that "if a foreign corporation purposefully avails itself of the benefits of an economic market in the forum State" and "engage[s] in continuous and widespread solicitation of business within a State," then it "clearly has 'fair warning that [its] activity may subject [it] to the jurisdiction of a foreign sovereign.'" *Id.* at 307-08 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 218 (1977) (Stevens, J., concurring) (alterations in original)). Fairly warned that a state might tax them, persons can participate, at least through petitioning and speech, in the political process that decides whether it will. *Cf. Borough of Duryea v. Guarnieri*, __ U.S. __, 131 S. Ct. 2488, 2499-500 (2011) ("Petitions allow[] participation in democratic governance even by groups excluded from the franchise." (citation omitted)). Fairly warned that a state will tax certain conduct, the decision to engage in that conduct is tantamount to consent to be taxed. *Cf. Int'l Shoe Co. v. Washington*, 326 U.S. 310, 318 (1945) ("[S]ome of the decisions holding the corporation amenable to suit have been supported by resort to the legal fiction that it has given its consent to service and suit, consent being implied from its presence in the state through the acts of its authorized agents." (citations omitted)).

These principles give strength to Gordon's argument that even a *federal* duty to comply with state and local tax laws may transgress due process limits on the taxation power. True enough, Gordon possesses minimum contacts with the federal government that will enforce his duty, but should we not also

demand that he possess minimum contacts with the state and local governments that will define his duty? The Framers saw the legislative process – which defines rather than enforces our duties – as the bulwark against oppressive taxation.[9] THE FEDERALIST NO. 35 (Alexander Hamilton) ("Is it not natural that a man who is a candidate for the favor of the people, . . . should be willing to allow them their proper degree of influence upon his conduct? This dependence, and the necessity of being bound himself . . . by the [taxes] to which he gives his assent, are the true, and they are the strong chords of sympathy between the representative and the constituent."); THE FEDERALIST NO. 84 (Alexander Hamilton) (arguing that the people can rely on legislative accountability to ensure that legislatures do not exercise their taxing discretion to eliminate the freedom of the press). And the Supreme Court has long acknowledged the importance of this structural check. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 428 (1819) ("The only security against the abuse of th[e] power [to tax], is found in the structure of the government itself. In imposing a tax the legislature acts upon its constituents. This is in general a sufficient security against erroneous and oppressive taxation."); *Int'l Harvester Co. v. Wisconsin Dep't of Taxation*, 322 U.S. 435, 451 (1944) (Jackson, J., dissenting) ("Representation is the ordinary guaranty of fairness in taxation."); *Helvering v. Gerhardt*, 304 U.S. 405, 415 (1938) ("State taxation of national instrumentalities is subject to no [democratic] restraint, for the people outside the state have no

---

[9] By focusing on enforcement alone, my dissenting colleague is missing an important piece of the picture. *See post*, at 2-3 (Kavanaugh, J., dissenting). His preoccupation with the question of which government will hail Gordon into court obscures important distinctions between "the due process standards for adjudicative jurisdiction and those for legislative (or prescriptive) jurisdiction." *See Quill*, 504 U.S. at 319-20 (Scalia, J., concurring).

representatives who participate in the legislation; and in a real sense, as to them, the taxation is without representation."). Without fair warning of which state and local legislatures will be constructing his tax burden, Gordon would lose a critical safeguard at the heart of democratic legitimacy. Gordon's "minimum connection" with Congress affords him some security, to be sure, but it is not clear that his attenuated recourse to Congress to redress "erroneous or oppressive" taxes levied by state and local legislatures satisfies the Due Process Clause.

ii

Another "simple but controlling question" to test the lawfulness of an exercise of taxation power is "whether the state has given anything for which it can ask return." *See Nat'l Bellas Hess v. Dep't of Revenue*, 386 U.S. 753, 756 (1967) (internal quotation marks omitted); *see also Quill*, 504 U.S. at 306. *Cf. New York ex rel. Cohn v. Graves*, 300 U.S. 308, 313 (1937) ("Enjoyment of the privileges of residence in the state and the attendant right to invoke the protection of its laws are inseparable from responsibility for sharing the costs of government."). In order to protect this principle of just exchange, we uphold "the power of a state to impose liability on an out-of-state seller to collect a local use tax [when] the out-of-state seller was plainly accorded the protections and services of the taxing state." *Nat'l Bellas Hess*, 386 U.S. at 757. When minimum contacts with the state or locality are present, the taxed party receives "the benefits and protections of the laws of [the] state," *Int'l Shoe Co.*, 326 U.S. at 319, and there is no due process problem with the state or locality extracting revenue from that party's transactions. But when minimum contacts with that state or locality are lacking, the state or locality offers no services or protections to justify the tax it receives. Gordon may be correct that the due process

defects of this imbalanced exchange do not disappear simply because the federal government brokers it.

In light of these principles, the district court did not abuse its discretion by concluding that Gordon is likely to succeed on this first step of his merits argument. In so holding, we caution that we are not deciding as a matter of law which sovereign a court must look to in completing its minimum contacts analysis. That question is one of significant moment, touching core federalism concerns. *J. McIntyre Mach., Ltd.*, 131 S. Ct. at 2789. And as this discussion reveals, the PACT Act has been cast in a mold that has never been constitutionally tested. We are unwilling to resolve such an important and novel constitutional question without the benefit of further factual development.

Before we may affirm the preliminary injunction, however, we must address the second constitutional question that informed the district court's conclusion that Gordon is likely to succeed on the merits of his claim.

2

Under Section 2a of the PACT Act, Gordon's obligation to collect a given state or local tax attaches when he initiates a transaction within that jurisdiction. Gordon's due process challenge presents the question whether a single sale is enough to establish minimum contacts with that jurisdiction. The government asserts it is, providing a constitutional basis for the Act even if Gordon is correct that the Due Process Clause demands minimum contacts with the state or local taxing authority. Appellants' Br. 30-33. Once again, the question is a close one, deserving of further development at a trial on the merits, so we affirm and remand. *See Red Earth*, 657 F.3d at 145 (affirming a preliminary injunction against Section 2a of

the PACT Act on this ground and remanding for a trial on the merits).

Due process jurisprudence on "minimum contacts" has evolved significantly over the past half-century. In *National Bellas Hess v. Department of Revenue*, the Supreme Court held that minimum contacts do not exist between a state and a seller "whose only connection with customers in the State is by common carrier or the United States mail." 386 U.S. at 758; *see also Miller Bros. Co.*, 347 U.S. at 344-45. *National Bellas Hess* was commonly understood to require that the seller have some "physical presence" in the taxing state. *Quill*, 504 U.S. at 306-07. Thirty years later, in *Quill*, the Supreme Court overruled that holding. *Id.* at 308. Relying on "comparable" reasoning in cases concerning the personal jurisdiction of courts, the Court concluded that North Dakota's imposition of a duty to collect a use tax on Quill did not violate the Due Process Clause, even though Quill's only contacts with citizens of North Dakota occurred by means of mail or common carrier. *Id*. The court relied on the fact that Quill purposefully directed its activities at residents of North Dakota, that it had conducted a high volume of business with customers in that state, and that the use tax was "related to the benefits Quill receives from access to the state." *Id.*

But "[t]he Supreme Court has never found 'that a single isolated sale . . . is sufficient'" to establish minimum contacts. *Red Earth*, 657 F.3d at 145 (quoting *J. McIntyre Mach., Ltd.*, 131 S. Ct. at 2792 (Breyer, J., concurring)). While it may prove to be the case that, in the Internet age, a single sale establishes "minimum contacts" as a matter of law, this seems like precisely the sort of difficult constitutional question on which our analysis would benefit from factual development. For example, how difficult is it for a delivery seller to identify and calculate applicable taxes at the point of sale? What sorts of

services do states provide to delivery sellers (e.g., a forum for collecting debts from buyers, trash disposal for shipping cartons)? Without this knowledge, we find no reason to upset the district court's reasonable conclusion that Gordon has demonstrated a likelihood of success on the merits of his due process challenge to the tax provisions of the PACT Act. We underscore that our analysis is preliminary; we make no final determination on the merits of Gordon's due process challenge.

B

We likewise hold that the district court did not abuse its discretion in determining where the public interest lies when it concluded that "enforcement of a potentially unconstitutional law that would also have severe economic effects is not in the public interest." *Gordon*, 826 F. Supp. 2d at 297.

Relying upon *United States v. Oakland Cannabis Buyer's Coop.*, 532 U.S. 483, 497 (2001), the government argues that the court erred as a matter of law "by failing to give any deference to Congress's assessment of where the public interest lies." Appellants' Br. 39. [10] In *Oakland*, the government invoked the Controlled Substances Act to enjoin the cooperative from distributing marijuana. Citing the "public interest," the district court modified the injunction to permit distribution in cases of medical necessity. 532 U.S. at 495. The Supreme Court overturned the court of appeals decision affirming the modified injunction, holding that the district

---

[10] The government also seeks support for this argument in *Able v. United States*, 44 F.3d 128, 131-32 (2d Cir. 1995). The government's reliance on *Able* is misplaced. The cited holding relates not to the "public interest," but to the "likelihood of success on the merits." *Id.* at 130-31.

court's considerable discretion to fashion equitable relief is bounded when it comes to deciding whether the "public interest" favors an injunction. *Id.* at 497. The district court could not "'ignore the judgment of Congress, deliberately expressed in legislation'" by considering "any and all factors that might relate to the public interest." *Id.* (quoting *Virginian Ry. Co. v. Ry. Sys. Fed'n No. 40, Emps. Dep't of the Am. Fed'n of Labor*, 300 U.S. 515 (1937)).

The district court did not transgress the limits on its discretion here. *Oakland* prohibits a district court from second-guessing Congress's lawful prioritization of its policy goals. *Id.* For example, under the rationale of *Oakland*, it would have been wrong for the district court to hold that the public interest in preserving tobacco industry jobs outweighs the public health harms attributable to underage smoking. Such a holding would interfere with Congress's "delegated powers" to "decide[] the order of priorities." *Id.* (internal quotation marks omitted). But the district court here did not second-guess Congress's policy priorities – only the lawfulness of Congress's means of achieving those priorities. In doing so, the court acknowledged the obvious: enforcement of an unconstitutional law is always contrary to the public interest. *See, e.g.*, *Lamprecht v. FCC*, 958 F.2d 382, 390 (D.C. Cir. 1992); *G & V Lounge v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994); *Llewlyn v. Oakland Cnty. Prosecutor's Office*, 402 F. Supp. 1379, 1393 (E.D. Mich. 1975) ("[I]t may be assumed that the Constitution is the ultimate expression of the public interest."). The Constitution does not permit Congress to prioritize any policy goal over the Due Process Clause.

## C

Finally, we hold that the district court did not abuse its discretion when it concluded that Gordon was likely to suffer irreparable harm and that the balance of the equities tips in his favor.

Gordon argued that the PACT Act would cause him irreparable harm because it threatened the existence of his business and violated his constitutional rights. "[S]uits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Davis v. District of Columbia*, 158 F.3d 1342, 1346 (D.C. Cir. 1998). Thus, "[a]lthough a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes." *Id.* (internal citation omitted). The district court did not abuse its discretion by concluding that Gordon had demonstrated such a threat: when he was in business, the Act required Gordon to pay what he alleges are unconstitutional taxes or else risk criminal and civil penalties.

Similarly, the district court concluded that "a potential deprivation of [Gordon's] constitutional right to due process . . . outweighs the possible injury to defendants from enjoining enforcement until the merits of Gordon's claim can be determined." *Gordon*, 826 F. Supp. 2d at 297. Although the preliminary injunction might temporarily frustrate the federal government's interest in enforcing state and local tax laws, the district court permissibly gave greater weight to the possibility that Gordon could suffer an ongoing constitutional violation while this litigation proceeds.

Now that Gordon's business has ceased operations, he arguably no longer faces the dilemma on which the district court based its finding of irreparable injury. Neither does the government face the prospect of watching Gordon's cigarette sales go untaxed. As the administrator of the injunction, the district court is better placed than we are to judge its ongoing necessity. Our charge in a § 1292(a)(1) appeal is limited to determining whether the district court acted within its discretion by issuing the preliminary injunction in the first instance. Finding no abuse of discretion, we decline the government's invitation to vacate the injunction. In reaching that decision, we are sensitive to the gravity of enjoining an act of Congress, even temporarily. The government remains free to petition the district court for relief from the preliminary injunction in light of the changed circumstances. *See* FED. R. CIV. P. 60(b) (empowering the district court to "relieve a party" from an order).

III

Before we turn to the claims the district court dismissed, we must consider the government's argument that the preliminary injunction is overbroad. The government argues that the injunction, which bars it from enforcing the tax provisions against Gordon at all, should have prohibited it only from enforcing the provisions against Gordon's sales into jurisdictions with which he lacks minimum contacts. We hold that the district court adequately fulfilled its duty to "maintain the act in so far as it is valid." *Red Earth*, 657 F.3d at 145 (quoting *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684 (1987)). By demanding that the injunction be narrower, the government asks the district court to put the cart before the horse. To accede to the government's argument, the district court would not only have to define the much-disputed concept of "minimum contacts," but would also have to engage in

significant fact-finding to determine where around the country Gordon has established minimum contacts. *See* Marcia Gordon Second Decl. ¶ 13 ("There are several states in which we have made zero or very few sales. In addition, there are many local jurisdictions in which we have never made a sale."). Preliminary injunction hearings are ill-suited for such fine tailoring.

More fundamentally, we are not convinced by the government's premise: that Gordon may challenge the PACT Act only "as applied" against his sales into jurisdictions with which he lacks minimum contacts. The government points out that a court may find a statute to be invalid on its face only if a plaintiff has shown that the Act has no "plainly legitimate sweep." *Wash. State Grange v. Wash. State Repub. Party*, 552 U.S. 442, 449 (2008) (citation omitted); *see also United States v. Salerno*, 481 U.S. 739, 745 (1987) (holding that facial challenges will be sustained only if "no set of circumstances exist under which the Act would be valid"). The government argues that any facial challenge to the PACT Act must fail because there is no dispute that the federal government may compel a delivery seller to collect taxes for at least those state and local governments with which it has minimum contacts. Thus, the Act has a "plainly legitimate sweep," even if it sweeps too broadly.

But when a statute erases the boundaries that define a sovereign's jurisdiction, as the PACT Act does to the boundaries of state and local taxing jurisdictions, any legitimate application is pure happenstance. It is perhaps this consideration that has led the Supreme Court to sustain facial challenges to laws that omit constitutionally-required jurisdictional elements, even though all such laws necessarily have a "plainly legitimate sweep." For example, in *United States v. Lopez*, the Supreme Court struck down the Gun-Free

School Zones Act of 1990, a federal law that prohibited individuals from knowingly possessing firearms within school zones. 514 U.S. 549, 551 (1995). The text of the statute "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." *Id.* at 561; *see also United States v. Morrison*, 529 U.S. 598, 613 (2000) (relying on *Lopez* to sustain a facial challenge to the Violence Against Women Act). Similarly, if Gordon's due process analysis is correct, the PACT Act contains "no jurisdictional element which would ensure" that the taxes it imposes comport with the Due Process Clause. It permits state and local taxing powers to bleed over from legitimate objects of taxation to cover objects foreign to the state or local jurisdiction. Following the Supreme Court's lead, we are not willing to hold – at the preliminary injunction stage – that Gordon is unable to maintain a facial challenge.

IV

We review de novo the district court's dismissal of Gordon's remaining claims. *See Schrader v. Holder*, 704 F.3d 980, 984 (D.C. Cir. 2013).

A

Gordon argues that Section 2a violates the Tenth Amendment by commandeering states to administer a federal taxation scheme.[11] The district court properly dismissed this Tenth Amendment challenge for failure to state a claim for

---

[11] Gordon has standing to bring a claim that he was injured by Congress's "disregard of the federal structure of our Government," as reflected in the Tenth Amendment. *See Bond v. United States*, __ U.S. __, 131 S. Ct. 2355, 2366-67 (2011).

relief. As the government points out, the type of burden the PACT Act creates is different in kind from the burdens the Supreme Court held to violate the Tenth Amendment in *New York v. United States*, 505 U.S. 144 (1992), and *Printz v. United States*, 521 U.S. 898 (1997).

This is not a case in which "the Federal Government [is] compel[ling] the States to implement, by legislation or executive action, federal regulatory programs." *Printz*, 521 U.S. at 925. Instead of drafting states to enforce federal law, the PACT Act pledges the federal government to enforce state law. *See* 15 U.S.C. § 377 (imposing federal criminal penalties for violating the delivery sale provisions of the PACT Act). States may still craft their tax codes to accomplish their own policy goals. If a state wishes to increase tobacco consumption or to promote its use among minors, it retains the discretion to do so.

In fact, the challenged provisions of the PACT Act do not direct the states to do anything. Any administrative burden that results is merely incidental to Congress's lawful exercise of its power to regulate the private participants in interstate commerce. In *New York*, the Court left open the possibility that Congress could pursue permissible policy goals by directly regulating private parties rather than states. 505 U.S. at 159-60. That is what Congress has done here.

The affirmative burdens placed on the states in *Printz* and *New York* were unavoidable. By contrast, states may avoid any burdens imposed by the PACT Act – a distinction the Supreme Court has treated as constitutionally significant. In *FERC v. Mississippi*, for example, the Court rejected a Tenth Amendment challenge to a federal statute that called for states to consider federal standards in regulating public utilities. 456 U.S. 742 (1982). The Court emphasized that "if a State has no

utilities commission, or simply stops regulating in the field, it need not even entertain the federal proposals." *Id.* at 764; *see also Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 288 (1981) (affirming a federal statute with similar reasoning). The Court in *New York* distinguished *FERC v. Mississippi* on these grounds, noting that there was nothing in the law at issue in *FERC* "directly compelling" the state to participate in the federal regulatory program. *New York*, 505 U.S. at 161-62; *see also Printz*, 521 U.S. at 925-26. This case is much more like *FERC* than *New York*. If states wish to tax delivery sales of tobacco products, they may have to answer the federal call to accept pre-paid taxes from out-of-state sellers. Still, they may avoid that federal mandate altogether by not taxing tobacco delivery sales. Congress may lawfully present states with this Hobson's choice because it has the power to prevent states from taxing interstate commerce altogether. *See FERC*, 456 U.S. at 759.

Additionally, the PACT Act does not blur the lines of political accountability as did the statute challenged in *New York*, 505 U.S. at 169. Here, states still freely set the tax rates for which they may be held accountable. And because the Act applies directly to the sellers, it is clear that Congress is the source of the new duty, not the states. *See United States v. Morrison*, 529 U.S. 598, 654 n.21 (2000) (Souter, J., dissenting) ("Had Congress chosen . . . to proceed instead by regulating the States, rather than private individuals, this accountability would be far less plain.").

The PACT Act regulates individuals, not states; its only incidental effect on the states is to require them to collect additional tax revenue if they choose to join Congress in regulating interstate commerce in tobacco products. This sort of burden is constitutionally permissible.

B

The district court also properly dismissed Gordon's Fifth Amendment challenge to the PACT Act's ban on shipping tobacco products in the U.S. mail. Gordon argues that the ban deprives him of due process and the equal protection of the laws.

There is no dispute that the district court properly applied rational basis review to the mail ban. Accordingly, Gordon has a claim only if he can show that there is no "rational relationship between [the ban] and some legitimate governmental purpose." *Am. Bus. Ass'n v. Rogoff*, 649 F.3d 734, 742 (D.C. Cir. 2011) (citation omitted). This burden "to negative every conceivable basis which might support" the law is especially difficult to meet. *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993). Rational basis review "is not a license for courts to judge the wisdom, fairness, or logic of legislative choices." *Id.* at 313. Courts must uphold legislation "[e]ven if the classification involved . . . is to some extent both underinclusive and overinclusive . . . ." *Vance v. Bradley*, 440 U.S. 93, 108 (1979). In the ordinary case, "a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous." *Romer v. Evans*, 517 U.S. 620, 632 (1996).

Gordon argues that this is no ordinary case because Congress has never before banned the shipment of a product that is legal in all fifty states and does not present a danger to the mail or mail carriers. Appellee's Br. 47. Unprecedented laws, he asserts, are subject to more "careful" rational basis review under *Romer v. Evans*. Appellee's Br. 50; *see also Romer*, 517 U.S. at 633 (discussing the unprecedented nature of the law under review). We need not decide whether *Romer*

announced such a rule because the mail ban is not unprecedented. The government provides – and Gordon fails to distinguish – several examples of articles Congress has banned from the U.S. mail that are legal in all fifty states and do not present a danger to the mail or mail carriers. *See, e.g.*, 39 U.S.C. § 3002 (making vehicle master keys nonmailable); *id.* § 3002a (making locksmithing devices nonmailable). We therefore examine this law as we examine any other law that does not infringe on a fundamental right or involve a suspect classification.

Although we are by no means restricted to the stated reasons for passing a law in our search for a "rational basis," *Beach Commc'ns*, 508 U.S. at 315, we need look no further than the statute itself to discern *three* rational bases for the mail ban. As we observed in *Gordon I*, Section 1 of the Act reveals that it was "aimed primarily at combating three evils: tobacco sales to minors, [illicit] cigarette trafficking, and circumvention of state taxation requirements." 632 F.3d at 723 (citing Pub. L. No. 111-154, § 1(b)). Gordon does not dispute that these purposes are "legitimate governmental purposes," but argues that the mail ban fails to advance them because it is duplicative, overinclusive in some ways, and underinclusive in others. His arguments ask us to engage in a higher level of scrutiny than rational basis review allows.

For example, Gordon argues that Congress could have accomplished the goal of preventing illicit cigarette trafficking by enhancing penalties for violations of existing laws, rather than broadly excluding both licit and illicit tobacco deliveries from the mail. Once again, the legislative record reveals a rational basis for choosing one path over the other: delivery sellers "have been very successful at eluding traditional enforcement measures, by making their cigarette and smokeless tobacco deliveries by mail." H.R. Rep. No. 111-117,

at 19 (2009). Our standard of review does not permit us to second-guess the wisdom of that choice.

With respect to sales to minors, Gordon argues that the mail ban is duplicative because Congress promulgated age verification requirements in 15 U.S.C. § 376a(b)(4). Yet his next argument betrays an awareness that age verification requirements are only partially effective. He claims that the mail ban is underinclusive because it does not cover underage sales that occur at brick and mortar stores, which are also subject to age verification requirements. *See* Appellee's Br. 54 n.14 (citing Tobacco Free Kids Org., *Where Do Youth Smokers Get Their Cigarettes?*, http://www.tobaccofreekids.org/resear ch/factsheets/pdf/0073.pdf (last accessed June 7, 2013)). But Congress "must be allowed leeway to approach a perceived problem incrementally." *Beach Commc'ns*, 508 U.S. at 316. Congress's judgment that the existing enforcement mechanisms must be supplemented by the partial solution of a mail ban is entirely rational.

Finally, Gordon argues that the mail ban is duplicative because the tax provisions already effectively prevent circumvention of state taxes. But as we note above, Congress concluded that the mail enables determined sellers to evade the law – including, presumably, the PACT Act's command that sellers pay state and local taxes in advance of the sale. It is entirely rational for Congress to buttress other legal provisions by closing a popular channel for noncompliant commerce.

Because Gordon has not met his high burden "to negative every conceivable basis" for the Act, *Beach Commc'ns*, 508 U.S at 315, the district court was correct to dismiss Gordon's claim. And because the only challenge to the mail ban was properly dismissed, we need not decide whether the district

court should have granted a preliminary injunction against the mail ban.

## V

For the foregoing reasons, the district court's decision is affirmed and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

KAVANAUGH, *Circuit Judge*, concurring in the judgment in part and dissenting in part: The majority opinion holds that key tax-related provisions of the Prevent All Cigarette Trafficking Act may be unconstitutional under the Due Process Clause's minimum contacts principle. The majority opinion therefore affirms the District Court's preliminary injunction barring the Federal Government from enforcing those provisions of the statute. I respectfully disagree. To obtain a preliminary injunction, a plaintiff must show, among other things, a likelihood of success on the merits. In my view, Gordon's Due Process Clause claim lacks merit. I would therefore vacate the preliminary injunction entered by the District Court.

In 2010, Congress passed and President Obama signed the Prevent All Cigarette Trafficking Act. That law requires cigarette sellers to comply with various state tax laws. The law was prompted by Congress's finding that Internet cigarette sellers were not complying with federal, state, and local tax laws, resulting in billions of dollars in lost tax revenue each year. Importantly for present purposes, violations of the Act are subject to *federal* criminal prosecution or *federal* civil suit. In such federal lawsuits, the United States is the relevant sovereign and jurisdiction. As I will explain, when the Federal Government (not a State) regulates a U.S. seller such as Gordon, there is no Due Process Clause minimum contacts issue.

To begin, it is well-settled that Congress may enact federal laws that require sellers of a product to comply with certain state laws. So long as the federal law is otherwise justified under the Constitution – for example, as a Commerce Clause regulation of commercial activity – the fact that the federal law piggy-backs on state law in this fashion is irrelevant. The Supreme Court has long upheld federal laws of that sort. *See Kentucky Whip & Collar Co. v. Illinois Central Railroad Co.*, 299 U.S. 334 (1937); *Clark Distilling*

*Co. v. Western Maryland Railway Co.*, 242 U.S. 311 (1917). A number of federal laws follow that model. *See, e.g.*, 7 U.S.C. §§ 1571, 1573 (no transfer of agricultural seeds into a State in violation of state law); 16 U.S.C. § 3372(a)(2) (no transfer of wildlife taken in violation of any state law); 18 U.S.C. §§ 842(c) (no transfer of explosives into a State where they are illegal under state law); 18 U.S.C. § 922(b)(2) (no transfer of firearms into a State where they are illegal under state law); 21 U.S.C. § 831(b) (online pharmacies must comply with the law of any State in which they do business or offer to do business); 31 U.S.C. § 5362(10)(A) (no online bets can be accepted where the bet is illegal in the State in which it is made); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728 (1979) ("state law may be incorporated as the federal rule of decision"); *Board of County Commissioners of the County of Jackson, Kansas v. United States*, 308 U.S. 343, 351-52 (1939) ("the state law has been absorbed, as it were, as the governing federal rule not because state law was the source of the right but because recognition of state interests was not deemed inconsistent with federal policy"); Henry M. Hart, Jr., *The Relations Between State and Federal Law*, 54 COLUM. L. REV. 489, 498 (1954) ("Congress rarely enacts a complete and self-sufficient body of federal law. The federal statutes are full of references, both explicit and implicit, to the law of some state.") (footnote omitted).

There is no dispute here that the relevant provisions of the Prevent All Cigarette Trafficking Act are valid under the Commerce Clause. The question concerns the law's compliance with the minimum contacts principle of the Due Process Clause.

When Congress enacts a federal law of this kind and renders violators of that law subject to *federal* criminal prosecution or *federal* civil suit, the law does not violate the

minimum contacts principle of the Due Process Clause. The reason is quite simple: In such federal-law cases, the relevant sovereign and jurisdiction is the United States, not one of the individual States. There is no Due Process minimum contacts issue raised by a federal-law suit against a seller located in the United States. That was the conclusion reached by a three-judge District Court in this Circuit when it rejected a similar Due Process Clause minimum contacts challenge to the Jenkins Act. That Act required cigarette shippers to report out-of-state sales to the buyer's state tobacco administrator. The Supreme Court summarily affirmed the Court's decision. *See Consumer Mail Order Association of America v. McGrath*, 94 F. Supp. 705, 712 (D.D.C. 1950), *aff'd*, 340 U.S. 925 (1951). I would reach the same conclusion here. *See Musser's Inc. v. United States*, 2011 WL 4467784, at \*5 (E.D. Pa. 2011) (denying preliminary injunction in Due Process Clause challenge to Prevent All Cigarette Trafficking Act).

To be sure, a seller like Gordon may raise a Due Process Clause minimum contacts objection in any *state-law* proceeding. *See Quill Corp. v. North Dakota*, 504 U.S. 298 (1992). But the Prevent All Cigarette Trafficking Act does not negate a seller's ability to raise a Due Process Clause minimum contacts objection in state-law cases.

In my view, therefore, Gordon's Due Process Clause claim is entirely without merit.[1] To grant a preliminary injunction, however, a District Court must find a likelihood of success on the merits, among other things. *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 20 (2008)

---

[1] The alternative Tenth Amendment argument advanced by Gordon in support of the preliminary injunction is likewise without merit, as the majority opinion explains and the District Court also concluded.

4

("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits . . . ."); *Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("a party seeking a preliminary injunction must demonstrate, among other things, a likelihood of success on the merits") (internal quotation marks omitted); *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1296 (D.C. Cir. 2009) (Kavanaugh, J., concurring) ("In light of the Supreme Court's recent decisions, I tend to agree . . . that the old sliding-scale approach to preliminary injunctions – under which a very strong likelihood of success could make up for a failure to show a likelihood of irreparable harm, or vice versa – is no longer controlling, or even viable. It appears that a party moving for a preliminary injunction must meet four independent requirements.") (citation and internal quotation marks omitted); *cf. Nken v. Holder*, 556 U.S. 418, 438 (2009) (Kennedy, J., concurring) ("When considering success on the merits and irreparable harm, courts cannot dispense with the required showing of one simply because there is a strong likelihood of the other.").

When, as here, a District Court incorrectly finds a likelihood of success on the merits, that legal error constitutes an abuse of discretion, and we must vacate the preliminary injunction. *See Kiyemba v. Obama*, 561 F.3d 509, 513 (D.C. Cir. 2009) ("If the moving party can show no likelihood of success on the merits, then preliminary relief is obviously improper and the appellant is entitled to reversal of the order as a matter of law."); *Air Line Pilots Association International v. Eastern Air Lines, Inc.*, 863 F.2d 891, 894 (D.C. Cir. 1988) ("We reverse the district court and hold that it should not have granted the motions for a preliminary injunction because the unions did not show a substantial likelihood of success on the merits."); *see generally So v. Suchanek*, 670 F.3d 1304, 1310 (D.C. Cir. 2012) ("A district court by definition abuses its

discretion when it makes an error of law.") (internal quotation marks omitted).[2]

Because Gordon's Due Process Clause claim is meritless, I would vacate the District Court's preliminary injunction against enforcement of the tax-related provisions of the Act. As to Gordon's cross-appeal challenging the District Court's denial of a preliminary injunction to enjoin enforcement of the Act's mailing ban on Fifth Amendment grounds, I would affirm the District Court because Gordon has not shown a likelihood of success on the merits of that claim, for reasons the majority opinion explains.

---

[2] In certain First Amendment cases, the Supreme Court has said that a court of appeals may affirm a District Court's preliminary injunction so long as the plaintiff has presented a "close" question on the merits. *See Ashcroft v. ACLU*, 542 U.S. 656, 664-65 (2004). But the "close" question standard is not the usual rule for preliminary injunctions or for appellate review of preliminary injunctions. And even if a close question were enough, Gordon has not presented a close question here.

SENTELLE, *Senior Circuit Judge*, concurring in part and concurring in the judgment: I reluctantly concur in the result announced in Judge Griffith's opinion. While this case may not be moot, it is not entirely clear what it is the parties are still litigating about, and I hope that the district court re-examines the mootness question with the benefit of a more full record.

I do not join fully in Judge Griffith's opinion because I think it opines on matters far beyond the issues before the court, and I do not wish to elevate those opinions to circuit law.

First, footnote 1 of Judge Griffith's opinion indulges, I think quite gratuitously, in a discussion of the effect of the so-called "Dormant Commerce Clause." So far as I can tell, no party in this case relies upon the Dormant Commerce Clause, the Dormant Commerce Clause is not relied upon in the briefs, the Dormant Commerce Clause has nothing to do with the result, and this case has nothing to do with the Dormant Commerce Clause.

Further, I cannot support Judge Griffith's opinion in its test of "democratic legitimacy" for the minimum contacts necessary to provide due process for taxation. Griffith op. at 19 21. The search for democratic underpinnings for constitutional provisions may be academically interesting, but I find no case in which this court, the Supreme Court, or any other federal court has undertaken that search before affirming the legitimacy of a tax. Because Judge Griffith's opinion supplies sufficient indicia of minimum contacts without relying on this novel approach, I join the result, indeed I join most of the opinion, but I cannot fully join the elevation to circuit law of a new test for minimum contacts, or of the discussion of the attributes of the "Dormant Commerce Clause."