# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 26, 2018          Decided July 31, 2018

No. 17-7171

ARCHDIOCESE OF WASHINGTON, DONALD CARDINAL WUERL,
A ROMAN CATHOLIC ARCHBISHOP OF WASHINGTON, A
CORPORATION SOLE,
APPELLANT

v.

WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY
AND PAUL J. WIEDEFELD, IN HIS OFFICIAL CAPACITY AS
GENERAL MANAGER OF THE WASHINGTON METROPOLITAN
AREA TRANSIT AUTHORITY,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-02554)

*Paul D. Clement* argued the cause for appellant. With him
on the briefs were *Michael F. Williams* and *Kasdin M. Mitchell*.

*John M. Gore*, Acting Assistant Attorney General, U.S.
Department of Justice, *Matthew J. Glover*, Counsel to the
Assistant Attorney General, *Matthew M. Collette* and *Nicholas
Y. Riley*, Attorneys, were on the brief for *amicus curiae* United
States in support of appellant.

*Shannen W. Coffin* was on the brief for *amici curiae* Ethics and Public Policy Center and First Liberty Institute in support of appellant.

*Jeffrey M. Johnson* and *Lisa M. Kaas* were on the brief for *amicus curiae* The Franciscan Monastery USA, Inc. in support of appellant.

*Ryan A. Shores* was on the brief for *amici curiae* Becket Fund for Religious Liberty, et al. in support of appellant.

*Donald B. Verrilli Jr.* argued the cause for appellees. With him on the brief were *Chad I. Golder*, *Jonathan Meltzer*, *Patricia Y. Lee*, and *Rex S. Heinke*. *Anthony T. Pierce* entered an appearance.

Before: ROGERS, KAVANAUGH[*] and WILKINS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

Concurring opinion filed by *Circuit Judge* WILKINS.

ROGERS, *Circuit Judge*:  The Washington Metropolitan Transit Authority ("WMATA") was established by compact between the State of Maryland, the Commonwealth of Virginia, and the District of Columbia to provide safe and reliable transportation services. *See* Pub. L. No. 89-774, 80 Stat. 1324 (1966).  Like other transit authorities, it sells commercial advertising space to defray the costs of its services, and for years it had accepted ads on all types of subjects.  In

---

[*] Circuit Judge Kavanaugh was a member of the panel at the time the case was argued but did not participate in this opinion.

2015 WMATA closed its advertising space to issue-oriented ads, including political, religious, and advocacy ads. This decision followed extended complaints from riders, community groups, business interests, and its employees, resulting in regional and federal concerns about the safety and security of its transportation services, vandalism of its property, and a time-intensive administrative burden reviewing proposed ads and responding to complaints about ads.

Since *Lehman v. City of Shaker Heights*, 418 U.S. 298 (1974), transit authorities have been permitted to accept only commercial and public service oriented advertisements because "a streetcar or bus is plainly not a park or sidewalk or other meeting place for discussion," but rather "is only a way to get to work or back home." *Id.* at 306 (Douglas, J., concurring). Under the Supreme Court's forum doctrine, WMATA, as a non-public forum, may restrict its advertising "[a]ccess . . . as long as the restrictions are 'reasonable and [are] not an effort to suppress expression merely because public officials oppose the speaker's view.'" *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 800 (1985) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983)). Based on experience that its approach to advertising was interfering with its ability to provide safe and reliable transportation service, WMATA adopted *Guidelines Governing Commercial Advertising*, employing broad subject-matter prohibitions in order to maintain viewpoint neutrality and avoid *ad hoc* bureaucratic determinations about which ads are benign and which are not. Guideline 12 states: "Advertisements that promote or oppose any religion, religious practice or belief are prohibited."

The Archdiocese of Washington contends that Guideline 12 violates the First Amendment and the Religious Freedom Restoration Act ("RFRA") and seeks a mandatory preliminary

injunction that would require WMATA to place an avowedly religious ad on the exteriors of its buses. The Archdiocese has not shown, however, that WMATA is impermissibly suppressing its viewpoint on an otherwise permitted subject, and its claim of discriminatory treatment is based on hypothesis. Following *Rosenberger v. Rector & Visitors of the University of Virginia*, 515 U.S. 819, 831 (1995), WMATA may exclude religion as a subject matter from its advertising space. Notably, there is no principled limit to the Archdiocese's conflation of subject-matter restrictions with viewpoint-based restrictions as concerns religion. Were the Archdiocese to prevail, WMATA (and other transit systems) would have to accept all types of advertisements to maintain viewpoint neutrality, including ads criticizing and disparaging religion and religious tenets or practices. Because the Archdiocese has not demonstrated a likelihood of prevailing on the merits or that the equities weigh favorably, it has not met the demanding standard for a mandatory preliminary injunction. *See Dorfmann v. Boozer*, 414 F.2d 1168, 1173 (D.C. Cir. 1969).

## I.

Until 2015, WMATA had accepted most issue-oriented advertisements, including political, religious, and advocacy ads. Beginning in 2010, WMATA began to reconsider its approach as a result of near-monthly complaints from its employees, riders, elected officials, and community and business leaders about its advertisements. *See* Decl. of Lynn M. Bowersox, WMATA Ass't Gen. Mgr., Cust. Serv., Comms. & Mktg., in support of Defs' Opp. to Mot. for TRO and Prel. Inj., ¶¶ 4–5 & Ex. A (Dec. 1, 2017) ("Bowersox Decl."). The complaints spanned objections to ads that were critical of the Catholic Church's position against use of condoms, to ads by People for the Ethical Treatment of Animals with graphic

images of animal cruelty, to ads opposing discrimination based on sexual orientation. The condoms ad, for example, "generated hundreds of angry phone calls and letters and generated the second-largest negative response to any ad[] ever run in WMATA advertising space." *Id.* ¶ 25. An "anti-Islam ad . . . was also a factor in WMATA's decision to change its advertising space to a nonpublic forum." *Id.* ¶¶ 11, 26. The Metro Transit Police Department and the United States Department of Homeland Security "feared that certain ads would, due to world events, incite individuals to violence on the system and harm WMATA employees and customers." *Id.* ¶ 11. Specifically, they referred to events following "a contest to create a cartoon depiction of the Prophet Muhammad." *Id.* A cartoon that was submitted as an ad to WMATA "raised concerns, because some Muslims consider drawing the Prophet Mohammed so offensive that they have reacted violently to such depictions in the past." *Id.* (differing spellings in original). "WMATA was aware that two gunmen were killed after they attempted to attack the building where the contest . . . was being held." *Id.* Additionally, a survey showed that "98% of the public was familiar with the types of ads found on buses, in trains, and in stations," that "58% opposed issue-oriented ads," and that "46% were extremely opposed to . . . issue-oriented ads." *Id.* ¶ 14.

On November 19, 2015, the WMATA Board of Directors, with representatives from Maryland, Virginia, and the District of Columbia, decided to narrow the subjects that it would accept in WMATA advertising space. Upon resolving that WMATA's advertising space is closed "to issue-oriented ads, including political, religious and advocacy ads," Res. 2015-55, the Board adopted *Guidelines Governing Commercial Advertising*, (Nov. 19, 2015) (eff. 30 days after adoption), including Guideline 12 prohibiting "[a]dvertisements that promote or oppose any religion, religious practice or belief."

The Board concluded that any economic benefit derived from issue-oriented advertising was outweighed by four considerations: (1) complaints from its employees, community opposition and outcry, and adverse publicity for WMATA; (2) security concerns from the Metro Transit Police Department and the United States Department of Homeland Security; (3) vandalism of WMATA property; and (4) the administrative burden associated with the time-intensive process of reviewing proposed ads and responding to complaints about ads. Bowersox Decl. ¶¶ 9–13. Since the *Guidelines* took effect, WMATA has regularly rejected ads as non-compliant with its *Guidelines*, including Guideline 12. *See id.* ¶ 17 & Ex. C.

The "Find the Perfect Gift" ad that the Archdiocese seeks to have WMATA place on the exterior of its buses depicts a starry night and the silhouettes of three shepherds and sheep on a hill facing a bright shining star high in the sky, along with the words "Find the Perfect Gift." The ad includes a web address and a social media hashtag. Its website, although still under construction when the ad was submitted to WMATA, "contained substantial content promoting the Catholic Church," including "a link to 'Parish Resources,' . . . a way to 'Order Holy Cards,' and . . . religious videos and 'daily reflections' of a religious nature." *Id.* ¶ 19. The Archdiocese explains that "[t]he 'Find the Perfect Gift' campaign is an important part of [its] evangelization efforts," Decl. of Dr. Susan Timoney, S.T.D., Sec'y for Pastoral Ministry and Social Concerns, Archdiocese of Wash., ¶ 4 (Nov. 27, 2017) ("Timoney Decl."), "welcoming all to Christmas Mass or . . . joining in public service to help the most vulnerable in our community during the liturgical season of Advent," Decl. of Edward McFadden, Sec'y of Commns., Archdiocese of Wash., serving Cardinal Donald Woerl, ¶ 3 (Nov. 27, 2017) ("McFadden Decl."). Dr. Timoney advises: "It is critically important for the goals of the . . . campaign that the

Archdiocese begin spreading its message before the Advent season" because "[t]he Roman Catholic Church teaches" that in "sharing in the long preparation for the Savior's arrival with the first Christmas, we renew our ardent desire for Christ's second coming." Timoney Decl. ¶ 5.

When the Archdiocese sought to purchase space for the "Find the Perfect Gift" ad on the exterior of Metrobuses, WMATA declined on the ground that it was impermissible under Guideline 12 "because it depicts a religious scene and thus seeks to promote religion." McFadden Decl. ¶¶ 7, 12, 16 (internal quotations omitted). On November 28, 2017, the Archdiocese filed a complaint for declaratory and injunctive relief under the First Amendment's Free Speech and Free Exercise Clauses, RFRA, and the Fifth Amendment's guarantees of due process and equal protection. The Archdiocese sought a declaration that Guideline 12 was unconstitutional under the First and Fifth Amendments and violated RFRA, and an injunction preventing WMATA from enforcing Guideline 12 to reject the Archdiocese's ad.

The district court denied the Archdiocese's motion for a temporary restraining order ("TRO") and preliminary injunction. 281 F. Supp. 3d 88 (D.D.C. 2017). Concluding the Archdiocese was not likely to succeed on the merits, the court ruled that Guideline 12 was consistent with the Free Speech Clause as a viewpoint neutral and reasonable regulation in a non-public forum, and that Guideline 12 did not burden the Archdiocese's right to free exercise as a neutral and generally applicable regulation not singling out religious activity for suppression. 281 F. Supp. 3d at 102–05, 107–14. The court also rejected the Archdiocese's arguments based on RFRA and the Fifth Amendment's Due Process and Equal Protection Clauses. *Id.* at 115–16. The court further concluded that the three other preliminary injunction factors did not weigh in

favor of granting injunctive relief, including because the Archdiocese's "irreparable harm argument rises and falls with its merits arguments." *Id.* at 116.

The Archdiocese appealed and filed an emergency motion for an injunction pending appeal, "preventing WMATA from denying the Archdiocese's 'Find the Perfect Gift' campaign," and an expedited appeal on the merits. This court denied the motion for a mandatory injunction pending appeal on December 20, 2017, but set an expedited briefing schedule. After initially maintaining the case is moot because Advent has passed, the government desisted once the Archdiocese indicated it "specifically intend[s] to ask to run this exact ad in the next Advent season," Oral Arg. Tr. 27 (Mar. 26, 2018) (counsel for WMATA).

**II.**

A preliminary injunction is an "extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010) (citation omitted). The moving party must make a "clear showing that four factors, taken together, warrant relief: likely success on the merits, likely irreparable harm in the absence of preliminary relief, a balance of the equities in its favor, and accord with the public interest." *League of Women Voters v. Newby*, 838 F.3d 1, 6 (D.C. Cir. 2016) (citations omitted). This court "reviews the district court's legal conclusions as to each of the four factors *de novo*, and its weighing of them for abuse of discretion." *Id.* at 6–7 (citing *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009)).

9

**A.**

On appeal, the Archdiocese contends that Guideline 12 "unconstitutionally abridges . . . free speech rights by suppressing *religious* viewpoints on subjects that WMATA otherwise allows on bus exteriors." Appellant's Br. 13 (emphasis in original). The Archdiocese also contends that WMATA enforces Guideline 12 "arbitrarily by permitting some religious speech while excluding the Archdiocese's," which "violates the First Amendment's free speech guarantee." *Id.* at 14. Further, the Archdiocese contends that Guideline 12 "raises problems under the Religion Clauses and RFRA" because "WMATA's exclusion of all religious speech from bus exteriors and its interference with the Archdiocese's religious exercise violates the Free Exercise Clause and RFRA, and WMATA's arbitrary enforcement puts it in the position of a religious censor . . . favor[ing] some religions over others in violation of the Establishment Clause (and equal protection principles)." *Id.*

**1.** To determine whether the Archdiocese has shown that it is likely to prevail on the merits requires a threshold determination of the nature of the forum at issue. The Supreme Court recently reaffirmed its "'forum-based' approach for assessing restrictions that the government seeks to place on the use of its property." *Minn. Voters Alliance v. Mansky*, 138 S. Ct. 1876, 1885 (2018) (quoting *Int'l Soc. For Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 678 (1992)). The Supreme Court has long recognized that "[e]ven protected speech is not equally permissible in all places and at all times" and that the government is not "require[d] . . . freely to grant access to all who wish to exercise their right to free speech on every type of [g]overnment property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Cornelius*, 473 U.S. at 799–800.

Under the forum doctrine, the Supreme Court acknowledges that "[t]he existence of a right of access to public property and the standard by which limitations upon such right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n*, 460 U.S. at 44. The Court identified three categories of property. First, public forums are "places which by long tradition or by government fiat have been devoted to assembly and debate," such as sidewalks or parks, where "the rights of the state to limit expressive activity are sharply circumscribed." *Id.* at 45. To enforce a content-based exclusion in a public forum, the regulation must satisfy strict scrutiny. *Id.* (citing *Carey v. Brown*, 447 U.S. 455, 461 (1980)). Second, designated public forums are those in which the government has "opened" public property "as a place for expressive activity." *Id.* "Although [the government] is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum." *Id.* at 46. Third, a non-public forum is public property which is not by tradition or designation a public forum, and "the [government] may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Id.* (citing *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns*, 453 U.S. 114, 131 n.7 (1981)). In this third category, policy or practice may establish that the property is not held open to the public for general debate because "the [government], no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* (quoting *U.S. Postal Serv.*, 453 U.S. at 129; citing *Greer v. Spock*, 424 U.S. 828, 836 (1976); *Adderley v. Florida*, 385 U.S. 39, 48 (1966)).

The Archdiocese fails to show that the advertising space on WMATA's buses is not properly treated as a non-public forum. Indeed, the Archdiocese conceded as much in the district court, affirming in response to questions that it was "conceding at this point that it's not a public forum" and that the district court "[did not] have to address that [contrary] argument anymore." 2017 Motion Hg. Tr. at 4–5. The Archdiocese further stipulated that the legal standard for non-public forums requires there be "no viewpoint discrimination and the restrictions that are applied are reasonable in the context and based on the purposes of the forum," *id.* at 3–4, the standard to which its briefs to this court have conformed. Its attempt to backtrack now comes too late, *see United States v. Olano*, 507 U.S. 725, 733 (1993); *Singleton v. Wulff*, 428 U.S. 106, 120 (1976), because other than pointing to the emergency nature of the TRO proceeding, the Archdiocese offers no explanation why this court should depart from the usual practice of deeming concessions in the district court waived for the purposes of appeal, *see, e.g.*, *Flynn v. Comm'r,* 269 F.3d 1064, 1068–69 (D.C. Cir. 2001).

Even absent the Archdiocese's concession, it is clear that WMATA's advertising space is a non-public forum. Having treated its advertising space as an open forum, WMATA's Board of Directors in 2015 made a considered decision based on experience to "close[]" its advertising space to specific subjects. Res. 2015-55. The Supreme Court's has recognized that "a state is not required to indefinitely retain the open character of [a designated public forum]," *Perry Educ. Ass'n*, 460 U.S. at 46, and that it may instead choose to convert a designated public forum back into a non-public forum because "the government retains the choice" regarding the status of its forum, *Arkansas Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 680 (1998); *see Cornelius*, 473 U.S. at 802, 803–04; *Lehman*, 418 U.S. at 304 (plurality opinion). Previously, this

court concluded that by accepting political advertising WMATA had designated its subway stations public forums. *Lebron v. WMATA*, 749 F.2d 893, 896 (D.C. Cir. 1984); *see also Am. Freedom Def. Initiative v. MTA*, 109 F. Supp. 3d 626, 628 (S.D.N.Y. 2015), *aff'd*, 815 F.3d 105 (2d Cir. 2016). Having plainly evinced its intent in 2015 to close WMATA's advertising space to certain subjects, the Board of Directors converted that space into a non-public forum in the manner contemplated by the Supreme Court. *See Cornelius*, 473 U.S. at 803–04.

Treatment of WMATA's advertising space as a non-public forum is consistent with longstanding Supreme Court precedent. In *Lehman*, the First Amendment challenge arose with respect to prohibiting political advertising on city buses. The Court held that advertising space on public transit was properly treated as a non-public forum because a "bus is plainly not a park or sidewalk or other meeting place for discussion" but rather "only a way to get to work or back home." *Lehman*, 418 U.S. at 306 (Douglas, J., concurring); *see also Cornelius*, 473 U.S. at 803–04. The Court drew on its precedent distinguishing between "traditional settings where First Amendment values inalterably prevail," and "commercial venture[s]," where "[p]urveyors of goods and services saleable in commerce may purchase advertising space." *Lehman*, 418 U.S. at 302–04 (plurality opinion) (internal quotation marks and citation omitted); *id*. at 305–06. (Douglas, J. concurring). In view of concerns about jeopardizing advertising revenues and "lurking doubts about favoritism, and sticky administrative problems [that] might arise in parceling out limited space," the Court concluded "the managerial decision to limit car card space to innocuous and less controversial commercial and service oriented advertising does not rise to the dignity of a First Amendment violation." *Id*. at 304 (plurality opinion); *see also id*. at 305–06 (Douglas, J., concurring). A contrary

conclusion would mean "display cases in public hospitals, libraries, office buildings, military compounds, and other public facilities immediately would become Hyde Parks open to every would-be pamphleteer and politician." *Id*. at 304 (plurality opinion).

The Archdiocese attempts to distinguish WMATA's bus exteriors from the public transit advertising space in *Lehman* because they "reach[] an audience in a quintessential public forum." Appellant's Br. 17 n.1. But it points to no precedent that visibility from a quintessential public forum, like a park or street, renders a non-public forum public or alters its status for the purposes of First Amendment analysis; were that the law, then the mere visibility of the Supreme Court plaza from the sidewalk, or of a military installation to passersby, might convey a constitutional obligation to host expression. The Archdiocese also attempts to distinguish *Lehman* because bus exteriors are "unlike the interiors with their distinct captive audience problems addressed in [*Lehman*]." *Id*. The rationale in *Lehman* was not so limited. The Supreme Court concluded that a city does not "by selling advertising space . . . turn[] its buses into free speech forums." *Lehman*, 418 U.S. at 305–06 (Douglas, J., concurring); *cf. Marks v. United States*, 430 U.S. 188, 193 (1977) (citation omitted).

The Supreme Court, in citing *Lehman* with approval in *Cornelius*, 473 U.S. at 803–04, underscored that transit systems, unlike spaces like parks and sidewalks that have historically been used for congregation and discussion, have a utilitarian purpose that governments are entitled to maintain, at least where they have provided a non-speech-suppressive rationale for regulation. City buses, by contrast, enjoy no historical tradition like parks and sidewalks because transit was a private enterprise in most American cities until the second half of the twentieth century. *See* George M. Smerk, *Urban*

*Mass Transportation: From Private to Public to Privatization*, 26 TRANSPORTATION J. 83, 83–84 (1986); Jay Young, *Infrastructure: Mass Transit in 19th- and 20th-Century Urban America*, OXFORD RESEARCH ENCYCLOPEDIA OF AMERICAN HISTORY, 5 & n. 30 (Mar. 2015) (citing DAVID E. NYE, ELECTRIFYING AMERICA: SOCIAL MEANINGS OF A NEW TECHNOLOGY, 1880-1940 at 90–91 (Cambridge: MIT Press 1992)).

**2.** WMATA's decision in Guideline 12 was consonant with recognition by the Supreme Court that the government has wide latitude to restrict subject matters — including those of great First Amendment salience, *see Minn. Voters Alliance*, 138 S. Ct. at 1885–86 (collecting citations on political speech); *Cornelius*, 473 U.S. 788 (political speech); *Rosenberger*, 515 U.S. at 831 (religious speech) — in a non-public forum as long as it maintains viewpoint neutrality and acts reasonably. Far from undermining First Amendment values, the Court has understood the latitude afforded the government in regulating a non-public forum to promote these values. The non-public forum preserves some speech where there is no constitutional obligation to do so. The Court explained:

> The *Cornelius* distinction between general and selective access furthers First Amendment interests. By recognizing the distinction, we encourage the government to open its property to some expressive activity in cases where, if faced with an all-or-nothing choice, it might not open the property at all. That this distinction turns on governmental intent does not render it unprotective of speech. Rather, it reflects the reality that, with the exception of traditional public fora, the government retains the choice of whether to

> designate its property as a forum for specified classes of speakers.

*Arkansas Educ. Television Comm'n*, 523 U.S. at 680. The government need not be forced into the choice between "the prospect of cacophony, on the one hand, and First Amendment liability, on the other." *Id.* at 681.

In addition to preserving speech, the non-public forum doctrine, by requiring that the government prospectively and categorically set subject matter regulations, *see Rosenberger*, 515 U.S. at 829, preserves the government's ability to manage potentially sensitive non-public forums while cabining its discretion to censor messages it finds more or less objectionable. This constraint is especially important in the context of religious speech, given our cultural and constitutional commitment to religious liberty and the historic role of religiously motivated dissent from government orthodoxy in the development of free-speech rights. *See, e.g., W. Va. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Because Guideline 12 prohibits religious and anti-religious ads in clear, broad categories, bureaucrats are not called upon to decide whether the ad criticizing the Catholic Church's position on condom usage, or the anti-Islam Muhammad ad, or the Find a Perfect Gift campaign ad is the more "offensive," or otherwise censor religious messages. WMATA's subject-based prohibition abides by the Supreme Court's recognition that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *Barnette*, 319 U.S. at 642; *see Masterpiece Cakeshop Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1731 (2018).

The Archdiocese's position would eliminate the government's prerogative to exclude religion as a subject matter in any non-public forum. It contends Supreme Court precedent prohibits governments from banning religion as a subject matter, and that Guideline 12 is unconstitutional for that reason. Not only is this position contrary to the Supreme Court's recognition that governments retain the prerogative to exclude religion as a subject matter, *see Rosenberger*, 515 U.S. at 831, it would also undermine the forum doctrine because the Archdiocese offers no principled reason for excepting religion from the general proposition that governments may exclude subjects in their non-public forums. Although religious speech might be an exception either because it is highly valuable or because it receives specific protection in the First Amendment, the same can be said of political speech on which the Supreme Court has upheld bans against constitutional challenges. *See, e.g.*, *Arkansas Educ. Television Comm'n*, 523 U.S. at 669; *Cornelius* 473 U.S. 788. The Archdiocese's position could have sweeping implications for what speech a government may be compelled to allow once it allows any at all, even forcing a choice between opening non-public forums to almost any private speech or to none, which the Supreme Court acknowledged in *Arkansas Educational Television Commission*, 523 U.S. at 680, was not merely hypothetical.

The Archdiocese contends also that, notwithstanding whether the exclusion of religion could ever be constitutional in any non-public forum, Guideline 12 is unconstitutional because, like the restrictions challenged in *Rosenberger*, *Lamb's Chapel v. Center Moriches Union Free School Dist.*, 508 U.S. 384 (1993), and *Good News Club v. Milford Central School*, 533 U.S. 98 (2001), it suppresses the Archdiocese's religious viewpoint on subjects that are otherwise includable in the forum. But far from being an abrogation of the distinction between permissible subject matter rules and impermissible

viewpoint discrimination, each of these cases represents an application of the Supreme Court's viewpoint discrimination analysis, of which Guideline 12 does not run afoul. In each, the Court held that the government had engaged in unconstitutional viewpoint discrimination because the challenged regulation operated to exclude religious viewpoints on otherwise includable topics. An examination of each case demonstrates the contrast between the breadth of subjects encompassed by the forums at issue and WMATA's in which, unlike the restrictions struck down by the Court, Guideline 12 does not function to exclude religious viewpoints but rather proscribes advertisements on the entire subject matter of religion.

In *Rosenberger*, the University's Guidelines stated that "the purpose of the [Student Activities Fund ("SAF")]" was "to support a broad range of extracurricular student activities that 'are related to the educational purpose of the University,'" because "the University[] 'recogni[zed] that the availability of a wide range of opportunities' for its students 'tends to enhance the University environment.'" *Rosenberger*, 515 U.S. at 824 (quoting Appendix to Pet. for Cert. 26, 61a). Its Guidelines "recognize[d] 11 categories of student groups that may seek payment to third-party contractors because they 'are related to the educational purpose of the University of Virginia,'" including "student news, information, opinion, entertainment, or academic communications media groups." *Id.* (quoting Appendix to Pet. for Cert. 61a–62a). The University denied funding for *Wide Awake: A Christian Perspective at the University of Virginia*, "invok[ing]" a Guideline "prohibit[ing] . . . funding on behalf of publications that primarily promot[e] or manifes[t] a particular belie[f] in or about a deity or an ultimate reality." *Id.* at 836 (internal quotation marks omitted). The Supreme Court found this Guideline to "effect[] a sweeping restriction on student thought . . . in the context of

University sponsored publications" and held the Guideline was viewpoint discriminatory because "[b]y the very terms of the SAF prohibition, the University *does not exclude religion as a subject matter* but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints." *Id.* at 831, 836 (emphasis added). The Court concluded that "[t]he prohibited perspective, not the general subject matter, resulted in the refusal to make third-party payments, for the subjects discussed [in *Wide Awake*] were otherwise within the approved category of publications." *Id.* at 831.

In *Lamb's Chapel*, the school property could be used for "the holding of 'social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community,'" but it could "not be used by any group for religious purposes." *Lamb's Chapel*, 508 U.S. at 386–87 (quoting New York Educ. Law § 414(1)(c) & Appendix to Pet. for Cert. 57a). When an evangelical church in the community and its pastor applied for permission to use school facilities to show lectures by Doctor James Dobson on his "views on the undermining influences of the media that could only be counterbalanced by returning to traditional, Christian family values instilled at an early stage," that is, a "[f]amily oriented movie — from a Christian perspective," permission was denied. *Id.* at 387–89 (citation omitted). The Supreme Court, acknowledging that "[t]here is no suggestion from the courts below or from the [school] District or the State that a lecture or film about child rearing and family values would not be a use for social or civic purposes otherwise permitted," reasoned that because "[t]hat *subject matter is not one . . . off limits* to any and all speakers," the government had impermissibly "denie[d] access to a speaker solely to suppress the point of view he espouses on an otherwise includable subject." *Id.* at 393–94 (quoting *Cornelius*, 473 U.S. at 806) (emphasis added).

Similar circumstances were present in *Good News Club*, where the Milford Central School "enacted a community use policy" stating purposes "for which its building could be used after school," including that "district residents may use the school for 'instruction in any branch of education, learning or the arts'" and that "the school is available for 'social, civic and recreational meetings and entertainment events, and other uses pertaining to the welfare of the community, provided that such uses shall be nonexclusive and shall be opened to the general public." *Good News Club*, 533 U.S. at 102 (quoting Appendix to Pet. for Cert. D1–D3). When the "sponsors of the local Good News Club, a private Christian organization for children ages 6 to 12," sought to use the school's facilities "to have 'a fun time of singing songs, hearing a Bible lesson and memorizing scripture,'" the district's interim superintendent denied their request on the ground that their proposed use "was 'the equivalent of religious worship.'" *Id.* at 103 (quoting Appendix to Pet. for Cert. H1–H2). The Supreme Court held that the school's "exclusion of the Good News Club based on its religious nature is indistinguishable from the exclusions in [*Rosenberger* and *Lamb's Chapel*]" and "that the exclusion constitutes viewpoint discrimination" because there was "no question that teaching morals and character development to children is a permissible purpose under Milford's policy" and "it is clear that the [Good News] Club teaches moral and character development to children," but was excluded from the use of school facilities "because Milford found the Club's activities to be religious in nature." *Id.* at 107–08.

The restriction in WMATA Guideline 12 is unlike those challenged in this trio of cases. In each case the property had been opened to a wide range of subjects without excluding religion and disallowing a religious viewpoint to be expressed in those forums was unconstitutional. To the extent those cases can be read to blur the line between religion-as-subject-matter

and a religious viewpoint, the Supreme Court's analysis emphasizes the breadth of the forums involved: the "broad range" of activities in service of "educational purpose" contemplated in *Rosenberger*, 515 U.S. at 824, and the capacious range of "social, civic and recreational meetings and entertainments, and other uses pertaining to the welfare of the community" that might have been permitted in *Lamb's Chapel*, 508 U.S. at 386, and *Good News Club*, 533 U.S. at 102. By contrast, WMATA's forum — its advertising space on the exteriors of its buses — is not so broad, much less inviting through its advertisements public debate on religion. Given the express boundaries and narrow character of WMATA's forum, the Archdiocese's "Find the Perfect Gift" ad does not represent an excluded viewpoint on an otherwise includable subject. The rejection of its ad instead reflects WMATA's implementation of a policy that the Supreme Court has deemed permissible in a non-public forum, namely the "exclu[sion of] religion as a subject matter," *Rosenberger*, 515 U.S. at 831; *see Lamb's Chapel*, 508 U.S. at 393.

The precedents from our sister circuits on which the Archdiocese relies do not disturb this understanding of the trio of Supreme Court cases. Although the Archdiocese maintains that *Rosenberger* does not permit the government to ban religion as a subject matter, Appellant's Br. 22–23, and that the circuit cases "interpret[] *Rosenberger* in just this way[,]" "reject[ing] arguments materially indistinguishable from WMATA's effort to defend the exclusion of religion and religious viewpoints," Appellant's Br. 23, in fact these cases underscore that precedent requires an evaluation of the forum the government has created in order to determine whether a challenged regulation discriminates on the basis of viewpoint, and are an application of that analysis, rather than an affirmation of the principle that religion as a subject may never be banned in a non-public forum.

Of the cases the Archdiocese cites, only the Second Circuit has directly addressed whether *Rosenberger* permits the exclusion of religion as a subject matter from a non-public forum. *Byrne v. Rutledge*, 623 F.3d 46 (2d Cir. 2010) concerned a forum much broader in scope than WMATA's. Vermont's regulation of vanity license plates allowed motorists to place secular messages relating to their "personal philosophy, beliefs, and values . . . identity and affiliation . . . and statements of inspiration," but excluded religious messages "on matters of self-identity or . . . statements of love, respect, or inspiration." *Id.* at 57. The Second Circuit held that the State had engaged in viewpoint discrimination because it "distinguish[ed] between those who seek to express secular and religious views *on the same subjects*." *Id.* at 56–57 (emphasis in original). Although observing that "*Lamb's Chapel*, *Rosenberger*, and *Good News Club*, read together, sharply draw into question whether a blanket ban such as Vermont's on all religious messages in a forum that has otherwise been broadly opened to expression on a wide variety of subjects can neatly be classified as purely a 'subject matter' restriction for purposes of First Amendment analysis," the court declined to "address bans on religious speech in forums limited to discussion of certain, designated topics," *id.* at 58–59. The court's holding thus accords with WMATA's view that the government may in a non-public forum it has established for its advertising space proscribe religion as a subject matter consistent with the Supreme Court's precedent. This view also accords with that of the Ninth Circuit, which has held that *Rosenberger* permits a school district seeking to avoid "disruption" to proscribe display of religious messages in a non-public forum reserved for commercial messages. *See DiLoreto v. Downey Unified School Dist.*, 196 F.3d 958, 967–70 (9th Cir. 1999).

The other circuit cases that the Archdiocese cites aid it even less because they do not construe *Rosenberger*, but apply it to invalidate as viewpoint discriminatory government policies that sought to exclude religious viewpoints on otherwise includable topics in a non-public forum. The Seventh Circuit struck down the exclusion of religious "seasonal displays" where "comparable secular holiday displays by other private groups are permitted," *Grossbaum v. Indianapolis-Marion County Bldg. Auth.*, 63 F.3d 581, 588 (7th Cir. 1995), and prior to *Rosenberger* had struck down a policy prohibiting the distribution of religious literature in school where only "obscenity and libel" were similarly prohibited, *Hedges v. Wauconda Comm. Unit School Dist. No. 118*, 9 F.3d 1295, 1297–98 (7th Cir. 1993). The Eighth Circuit cited *Lamb's Chapel* in invalidating a school district policy permitting "any speech relating to moral character and youth development" but excluding a club that wished to speak on that topic from a religious perspective. *Good News/Good Sports Club v. School Dist. of Cty. of Ladue*, 28 F.3d 1501, 1506 (8th Cir. 1994). The Tenth Circuit simply reiterates the principle that "[i]f . . . the government permits secular displays on a nonpublic forum, it cannot ban displays discussing otherwise permissible topics from a religious perspective," *Summum v. Callaghan*, 130 F.3d 906, 918 (10th Cir. 1997).

The Archdiocese nonetheless contends that Guideline 12 suppresses its religious viewpoint to the extent it wishes to address topics such as charitable giving, Christmas, and opening hours on which WMATA allows non-religious but not religious messages. Similarly, the Franciscan Monastery USA, one of the Archdiocese's amici, maintains that its ad exhorting viewers to visit the Franciscan Monastery of the Holy Land in America expresses its religious viewpoint on places to visit, on which WMATA allows secular but not religious messages. These contentions are unpersuasive because the subjects on

which the Archdiocese and the Monastery claim they wish to speak through advertisements on WMATA buses are either not subjects within the forum or are not subjects on which they have shown they could not speak under Guideline 12.

The Archdiocese's "Find the Perfect Gift" ad is not primarily or recognizably about charitable giving, as it is not primarily or recognizably about opening hours or places to visit. Like the Monastery's ad, the Archdiocese's ad is a religious ad, an exhortation, repeatedly acknowledged by the Archdiocese to be part of its evangelization effort to attend mass at Catholic churches in connection with Advent. Timoney Decl. ¶ 4; McFadden Decl. ¶ 3. The imagery of the Archdiocese's "Find the Perfect Gift" ad is evocative not of the desirability of charitable giving, but rather the saving grace of Christ, which is not a subject included in the WMATA forum. Had the Archdiocese wished to submit an ad encouraging charitable giving, nothing in the record suggests it could not do so. WMATA accepted the ad of the Salvation Army, a religious organization whose ad exhorted giving to charity but contained only non-religious imagery. WMATA acknowledged in the district court, 2017 Mot. Hg. Tr. at 64, and again in this court that it would not reject as running afoul of Guideline 12 an ad from the Archdiocese that read "[P]lease [G]ive to Catholic Charities," Oral Arg. Tr. 31.

Nor has the Archdiocese pointed to an ad WMATA has accepted addressing Christmas except for commercial ads for Christmastime sales of goods. From these ads the Archdiocese concludes that Guideline 12 impermissibly excludes a religious viewpoint on Christmas while permitting a secular one. The Supreme Court, however, has rejected the view that accepting commercial advertising "create[s] a forum for the dissemination of information and expression of ideas" and "sanction[s] . . . [a] preference for . . . commercialism."

*Lehman*, 418 U.S. at 310, 315 (Brennan, J., dissenting); *see id.* at 302 (plurality opinion) (citations omitted); *id.* at 305–06, 308 (Douglas, J., concurring) (citations omitted). So understood, ads promoting Christmastime sales are not expressing a view on Christmas any more than a McDonald's ad expresses a view on the desirability of eating beef that demands the acceptance of a contrary ad from an animal rights group, or than a Smithsonian Air and Space Museum ad for a special stargazing event expresses a view on the provenance of the cosmos that demands a spiritual response. Commercial advertisements are designed to sell products: As the district court observed in noting the Archdiocese's evidentiary shortcomings for its argument that WMATA accepts advertisements that promote the commercialization of Christmas, commercial advertisements "proclaim: Shop Here! Buy This!" while saying nothing about the sellers' viewpoints on how Christmas should be observed. 281 F. Supp. 3d at 104. Or in terms used by the Supreme Court, the ads imploring the purchase of products do not invite "debate," *Rosenberger* 515 U.S. at 831, about how Christmas should be celebrated. Were a court to treat such commercial advertising as expressing a broader view, it would, furthermore, eviscerate the distinction between viewpoint-based and subject-based regulation on which the forum doctrine rests, and the longstanding recognition that the government may limit a non-public forum to commercial advertising.

**3.** Because WMATA's Guideline 12 is viewpoint neutral, the question remains whether "the distinctions drawn are reasonable in light of the purpose served by the forum." *Cornelius*, 473 U.S. at 806 (citing *Perry Educ. Ass'n*, 460 U.S. at 49). The reasonability inquiry is not a demanding one, but rather is a "forgiving test." *Minn. Voters Alliance*, 138 S. Ct. at 1888. The challenged "restriction 'need not be the most reasonable or the only reasonable limitation,'" *Hodge v. Talkin*,

799 F.3d 1145, 1165 (D.C. Cir. 2015) (quoting *Cornelius*, 473 U.S. at 808), but the regulation must simply be reasonable as consistent with the government's legitimate interest in maintaining the property for its dedicated use, *Perry Educ. Ass'n*, 460 U.S. at 46, 51.

In 2015, WMATA decided to avoid the divisiveness caused by certain advertisements and specifically to avoid the inflamed passions surrounding religion. Its adoption of Guideline 12 reflected a considered judgment after study, and including examination of the views of the marketplace. WMATA had fielded security concerns arising from the controversial ad depicting the Prophet Mohammed, which had prompted an armed attack at the place where the cartoon was produced. It also had weathered controversy surrounding an ad critical of the Catholic Church's position on condom usage. WMATA's closure of its forum to certain broad subjects is reasonable in light of its core purpose and experience, and is responsive to the very circumstances that prompted WMATA to reevaluate its advertising approach. The non-public forum WMATA created has a history not unlike that in *Cornelius*, 473 U.S. at 799–800, where the federal government redesigned a charity fundraising program in order to avoid workplace disruptions; so too WMATA's decision in 2015 to abandon a former approach to its advertising space that interfered with its ability to provide safe and reliable transportation "attractive to the marketplace," *Int'l Soc. For Krishna Consciousness*, 505 U.S. at 682.

Although a challenged regulation may be unreasonable, regardless of the reasons for its adoption, if it is inconsistently enforced, *see Minn. Voters Alliance*, 138 S. Ct. at 1888–90, the Archdiocese has not shown that "WMATA . . . appl[ies] [its] policy in arbitrary and unreasonable ways," Appellant Br. 30. The Archdiocese suggests WMATA has been inconsistent

insofar as it has accepted advertisements from religious speakers like the Salvation Army and a Christian radio station while rejecting the Archdiocese's "Find the Perfect Gift" ad. In fact, running the Salvation Army's and the radio station's ads underscores that WMATA is consistently rejecting ads that have religious content rather than discriminating against ads submitted by religious speakers. The Archdiocese's suggestion that WMATA has been inconsistent because it accepted an ad from a yoga studio containing the slogan "Muscle + Mantra," ignores that ad is not recognizably religious as the Archdiocese's ad plainly is, by its own characterization. Although a restriction may also be unreasonable if it is unclear what speech would be swept in or otherwise seriously hamper consistent administration, *see Minn. Voters Alliance*, 138 S. Ct. at 1888–90, given the history and experience that prompted WMATA to adopt Guideline 12 and WMATA's enforcement of it, the Archdiocese has not shown that Guideline 12 has failed to give adequate guidance on what is prohibited, or created so many marginal cases that it cannot be fairly administered. On the contrary, WMATA has articulated a "sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888 (citing *Cornelius*, 473 U.S. at 80–09).

The Archdiocese at oral argument clarified its position is that Guideline 12 is unreasonable because it is never reasonable to discriminate against religion. Oral Arg. Tr. 20–21. If by discrimination the Archdiocese refers to animus, there is no record evidence of WMATA animus, nor does the Archdiocese point to any now. Given Supreme Court precedent in *Cornelius* and *Perry Education Association* rejecting First Amendment challenges to subject matter exclusions in a non-public forum, the Archdiocese cannot mean discrimination as in demarcation of a subject matter. Any regulation must name its subject, and such naming is not the kind of textual hook from

which a court may infer animus. The Archdiocese's position is inconsistent with *Cornelius* and *Perry Education Association* where the Supreme Court instructs courts to analyze the reasonableness of the regulation in light of the purpose of the forum, not to intuit whether a freestanding regulation seems objectionable in isolation.

On the other hand, if the Archdiocese is objecting to the reasonableness standard itself where the subject of religion is barred in a non-public forum, this is either another attempt to backtrack from its concession in the district court or to undo long-standing precedent in *Lehman* as well as the forum doctrine. Addressing the argument on its own terms, the Archdiocese nowhere suggests that WMATA does not have a compelling interest in ensuring the safety and reliability of its transportation services and operating in a manner that maintains the attractiveness of its service to a multi-cultural, multi-ethnic, and religiously diverse ridership, including visitors to the Nation's capital and its *environs* from home and abroad, while simultaneously avoiding censorship in accord with the principles set forth in *Barnette*, 319 U.S. at 642. That is, even under a heightened standard, Guideline 12 is a management tool adopted in light of WMATA's experience that appropriately defines a limited forum for its advertising space.

**B.**

The Archdiocese's likelihood of success on its Free Exercise Clause and RFRA arguments is dubious at best. As a result, the Archdiocese's hybrid rights claim, *see* Appellant's Br. 37, fares no better because it requires independently viable free speech and free exercise claims, and "in law as in mathematics zero plus zero equals zero." *Henderson v. Kennedy*, 253 F.3d 12, 19 (D.C. Cir. 2001).

**1.** Generally, the Free Exercise Clause does not exempt individuals from complying with neutral laws of general applicability. *See Levitan v. Ashcroft*, 281 F.3d 1313, 1318 (D.C. Cir. 2002) (citing *Employment Div., Dep't of Human Resources v. Smith*, 494 U.S. 872, 878–79 (1990)). Non-neutral laws are impermissible because they have as their "object . . . to infringe upon or restrict practices because of their religious motivation." *Church of the Lukumi Babalu Aye v. Hialeah*, 508 U.S. 520, 533 (1993); *see also American Family Ass'n Inc. v. FCC*, 365 F.3d 1156, 1170–71 (D.C. Cir. 2004). As the Supreme Court explained in *Lukumi Babalu*, "[t]here are . . . many ways of demonstrating that the object or purpose of a law is the suppression of religion or religious conduct." *Lukumi Babalu*, 508 U.S. at 533. The Court "begin[s] with its text" and then considers whether there might be "governmental hostility which is masked, as well as overt." *Id.* at 533–34. The "[f]actors relevant to the assessment of governmental neutrality include 'the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body." *Masterpiece Cakeshop*, 138 S. Ct. at 1731 (quoting *Lukumi Babalu*, 508 U.S. at 540).

Nothing in the record indicates Guideline 12 was motivated by the "hostility" that motivated the city ordinance in *Lukumi Babalu*. The Archdiocese has made no showing, nor purported to make a showing, that the WMATA Board of Directors harbored any discriminatory intent or pro- or anti-religion bias in its decisionmaking process. Instead, there is ample record basis from which WMATA could reasonably conclude in 2015 that controversial advertisements, including advertisements with religious messages, interfered with its

ability to ensure rider safety and maintain employee morale, posed potential security risks, and fostered community opposition — all to the detriment of its attractiveness to ridership. Contrary to the Archdiocese's position that a discriminatory object is evident because WMATA's interests are not sufficient to support an exclusion of the subject of religion and because the District of Columbia allows similar advertisements on its stationary bus shelters, Guideline 12 evinces a level of means-and-ends fit that is inconsistent with the Archdiocese's contentions and generally with finding discrimination. In the face of experience that running religious ads caused controversy and even had the potential to cause violence, *see* Bowersox Decl. ¶¶ 9, 11, WMATA chose to exclude the subject of religion from its advertising space. It has also offered a secular purpose for doing so, which includes maximizing security of its transit system and minimizing vandalism of WMATA property. That rationale, and the secular basis for which there is no evidence of pretext, is inconsistent with finding discrimination.

Nor does the District of Columbia's approach to advertising on its stationary bus shelters evince any irrationality in WMATA's decisionmaking. The District government contracts with Clear Channel Outdoor to "provide[] and maintain[] bus shelters throughout the metropolitan area, and . . . sell[] advertising at or near the bus shelters." Compl. ¶ 12. WMATA contracts with a different company to administer its policy on advertising space of bus exteriors. *Id*. ¶ 16; Bowersox Decl. ¶ 27. The Archdiocese provides no reason the District government's approach for stationary space it controls should dictate the degree to which WMATA, as an interstate compact, is entitled to manage advertising space on its buses.

Of course, WMATA may not target religious speakers for exclusion from a generally available benefit. In *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017), the state government offered reimbursement grants to qualifying nonprofit organizations that installed playground surfaces made from recycled tires, but it had an express policy of denying grants to churches and other religious entities. That is, the state "pursued its preferred policy to the point of expressly denying a qualified religious entity a public benefit solely because of its religious character." *Id.* at 2024. WMATA is not discriminating based on the status of the speaker. As is clear, for example, from WMATA's acceptance of the Salvation Army ad, religious speakers are not excluded because they are religious speakers. That alone is sufficient to distinguish *Trinity Lutheran*.

Moreover, unlike *Trinity Lutheran*, this is a forum case. *Trinity Lutheran* involved a series of criteria for eligibility for which the church had "fully qualified," *id.* at 2023. WMATA, by contrast, has by adopting *Guidelines* created a forum in which the benefit in question — its advertising space — can no longer be said to be "generally available." It would strain *Trinity Lutheran* to read its prohibition on discriminating against religious speakers or speakers because of religious speech to suggest that exclusion of religion as a subject matter is necessarily discrimination against religious speakers. If that were the correct understanding of *Trinity Lutheran*, then it would have upended, *sub silentio*, *Rosenberger* and *Lamb's Chapel* as well as the forum doctrine because it would never be possible to exclude religion as a subject matter.

**2.** The Archdiocese is also unlikely to succeed on its RFRA claim for alternative reasons: not only has it failed to demonstrate a "substantial[] burden" on its "exercise of religion," 42 U.S.C. § 2000bb-1(a), that is, "substantial

pressure on an adherent to modify his behavior and to violate his beliefs," *Kaemmerling v. Lappin*, 553 F.3d 669, 678 (D.C. Cir. 2008) (quoting *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981)), but also RFRA would appear to be inapplicable to WMATA.

The Archdiocese alleges that advertising on public buses provide a "unique and powerful format" for its evangelization campaign because it "offers high visibility with consistent daily views," including in "many areas of the metropolitan region that are otherwise underserved and that other, more static advertising campaigns might miss." Compl. ¶ 15; *see* McFadden Decl. ¶¶ 8–10. But the Archdiocese has not alleged that its religion requires displaying advertisements on WMATA's buses promoting the season of Advent, much less the display of any advertisements at all. Instead, the Archdiocese has acknowledged that it has many other ways to pursue its evangelization efforts: in newspapers, through social media, and even on D.C. bus shelters. Compl. ¶¶ 11–12. Sincere religious beliefs are not impermissibly burdened by restrictions on evangelizing in a non-public forum where a "multitude of means" remains for the same evangelization. *See Mahoney v. Doe*, 642 F.3d 1112, 1121 (D.C. Cir. 2011); *Henderson*, 253 F.3d at 17. In these circumstances, the Archdiocese has not demonstrated a likelihood of success on its RFRA claim.

Even so, there is a threshold question whether RFRA can be constitutionally applied to WMATA. WMATA is an interstate compact between two sovereign states and the District of Columbia. *See* D.C. Code § 9-1107.01(4); Md. Code Transp. § 10-204(4); Va. Code Ann. § 33.2-3100(4). The Supreme Court has held that RFRA cannot constitutionally apply to the states, *see City of Boerne v. Flores*, 521 U.S. 507, 511 (1997), because it would impermissibly "curtail[] their

traditional general regulatory power" and impose "substantial costs" on the states, *id.* at 534. Although adding Virginia and Maryland to the WMATA Compact may not free the District of Columbia from its own obligation to comply with RFRA, *see Potter v. District of Columbia*, 558 F.3d 542, 544 (D.C. Cir. 2009), the District of Columbia's compliance with RFRA is not at issue. Rather the Archdiocese has challenged WMATA's compliance with RFRA, and WMATA is an instrumentality and agency of states to which the Supreme Court has concluded RFRA cannot constitutionally apply. Immunities conferred by Maryland and Virginia are not lost by the addition of the District of Columbia to the Compact. *See Morris v. WMATA*, 781 F.2d 218, 228 (D.C. Cir. 1986).

The Archdiocese's responds that RFRA applies to WMATA because Section 76(e) the Compact provides that if WMATA rules violate the laws, ordinances, rules, or regulations of a signatory, then the law of that signatory applies and the WMATA rule is void. *See* D.C. Code § 9-1107.01(76(e)). The Archdiocese's point would appear to cut against it, because the high degree of control each signatory retains over WMATA suggests the states did not cede their sovereignty by joining the Compact. In any event, it is unclear how RFRA could apply only to the District of Columbia as a Compact member when Maryland and Virginia have not ceded their sovereign prerogatives by joining the Compact, *see Tarrant Regional Water Dist. v. Herrmann*, 569 U.S. 614, 632 (2013); *Morris*, 781 F.2d at 227. The Archdiocese does not suggest that Section 76(e) could be judicially enforceable yet unconstitutional. Compacts generally have the status of federal law. *See Kansas v. Nebraska*, 135 S. Ct. 1042, 1053 (2015). To the extent enforcement in this context would "curtail[]" Maryland's and Virginia's "traditional general regulatory power," *City of Boerne*, 521 U.S. at 534, enforcing the

Compact provision would produce an unconstitutional result, *see Texas v. New Mexico*, 462 U.S. 554, 564 (1983).

The immunity issue was not thoroughly briefed by the parties, however. Suffice it to say, the Archdiocese's RFRA challenge poses that question as an antecedent issue due to the presence of two sovereign states in the Compact. For now the court need only conclude that the Archdiocese has not demonstrated that it is likely to prevail on the merits of its RFRA challenge, either due to the paucity of the TRO record or the immunity issue underlying the Archdiocese's reliance on Section 76(e).

## C.

The remaining preliminary injunction factors — irreparable injury, the balance of equities, and public interest — also do not weigh in the Archdiocese's favor. Although "[i]n First Amendment cases, the likelihood of success will often be the determinative factor in the preliminary injunction analysis," *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (internal quotation marks and citation omitted), this court has not yet decided whether *Winter v. National Resources Defense Council*, 555 U.S. 7, 20–22 (2008), is properly read to suggest a "sliding scale" approach to weighing the four factors be abandoned, *see League of Women Voters*, 838 F.3d at 7 (citation omitted). The instant case likewise "presents no occasion for the court to decide whether the 'sliding scale' approach remains valid after *Winter*." *Id.*

Were the Archdiocese to show a likelihood of success on the merits, *see supra* Part II.A & B, it would prevail on the final three factors because "the loss of constitutional freedoms, 'for even minimal periods of time, unquestionably constitutes

irreparable injury,'" *Mills v. District of Columbia*, 571 F.3d 1304, 1312 (D.C. Cir. 2009) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)).  This court has defined the irreparable injury analysis to "examine only whether [the constitutional] violation, if true, inflicts irremediable injury," *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 303 (D.C. Cir. 2006), because the harm both is "certain and great," "actual and not theoretical," and "imminen[t]," and also "beyond remediation," *id.* at 297 (citation omitted).  Conversely, the deprivation of constitutional rights constitutes irreparable injury only to the extent such deprivation is shown to be likely.  *See League of Women Voters*, 838 F.3d at 8-9 (citing *Winter*, 555 U.S. at 22).  The court has no occasion to decide whether, *see* Appellant's Br. 49, irreparable injury could weigh in favor of granting a preliminary injunction where there is no showing of a likelihood of success on the merits.

The same conclusion is true of the final two factors.  *See Pursuing America's Greatness*, 831 F.3d at 511 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)).  The Archdiocese maintains there will be no corresponding harm to WMATA if it runs the Archdiocese's "Find the Perfect Gift" ad, and that WMATA will benefit because it will have gained advertising revenues.  WMATA takes the opposite position, having concluded that the additional revenue from accepting such ads is outweighed by the impact on employee morale, community opposition, security concerns, vandalism, and administrative burdens that prompted WMATA to adopt the *Guidelines*.  Resolution here hinges on the likelihood of success on the merits because while the costs that WMATA has identified associated with running political, religious, and advocacy ads may outweigh the marginal benefit of additional advertising revenue, the calculus would be different weighing WMATA's costs against the Archdiocese's suffering a constitutional violation.

Similarly, although the Archdiocese contends that the final factor weighs in its favor because the public interest favors the protection of constitutional rights, the strength of the Archdiocese's showing on public interest rises and falls with the strength of its showing on likelihood of success on the merits. The public interest favors the protection of constitutional rights, *see, e.g.*, *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013), but the Archdiocese would need to show a likelihood of violation of its constitutional rights, and it has not done so.

In sum, religious speech and the free exercise of religion are of central First Amendment importance. Yet the Archdiocese presses an untenable position under Supreme Court precedent. By urging a capacious vision of viewpoint discrimination, it would effectively prevent the limitation of a non-public forum to commercial advertising, and upend decades of settled doctrine permitting governments to run transit companies without establishing forums for debate on the controversial issues of the ages and of the day, including not only the subject of religion but also politics and advocacy issues. Indeed, having allowed any speech, governments might be required to accept speech on all subjects because the Archdiocese offers no principled limit cabining its position to religion. Urging the finding of a free exercise violation based on no evidence of animus other than Guideline 12's naming of religion, the Archdiocese again invites the court to impute hostility on a heretofore unrecognized basis, and with no suggestion of how the proscription of the subject of religion might otherwise be effected in a non-public forum. This position not only finds no support in Supreme Court precedent, but would also upend it, something this lower court may not do. Accordingly, we affirm the denial of the preliminary injunction.

1

WILKINS, *Circuit Judge*:  I join in the Court's opinion.  I write separately to discuss the importance of traditional forum doctrine to protecting First Amendment values and to emphasize that WMATA's Guideline 12 conforms with those values.

A founding premise of our political system is that government is not a "competent judge" of truth.  *See* James Madison, Memorial and Remonstrance Against Religious Assessments (1785).  That responsibility belongs to the people, whose superior ability and authority in the marketplace of ideas is reflected and secured by the First Amendment.  *See Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994) ("At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence.").

Yet the Constitution accommodates those limited circumstances in which government must be permitted some control over expressive content to carry out its proper functions.  For instance, the government may "speak[] on its own behalf."  *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 135 S. Ct. 2239, 2251 (2015).  Additionally, the government may place speech-restrictive conditions on participation in its programs if those conditions are confined to the scope of the program.  *See, e.g.*, *U.S. Agency for Int'l Development v. Alliance for Open Society Int'l, Inc.*, 570 U.S. 205, 215-17 (2013); *FCC v. League of Women Voters of Cal.*, 468 U.S. 364, 399-401 (1984).  The government may also prohibit constitutionally unprotected speech, such as defamation or obscenity, so long as the restriction is based on proscribable content and not "hostility – or favoritism – towards the underlying message expressed."  *R.A.V. v. City of St. Paul*, 505 U.S. 377, 386 (1992); *see also City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 763-65 (1988).

These doctrines apply in different contexts but embody the same core First Amendment values: "that more speech, not less, is the governing rule," *Citizens United v. FEC*, 558 U.S. 310, 361 (2010), and that "the danger of censorship . . . is too great where officials have unbridled discretion over a forum's use," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975).

To preserve these values within the practical realities of government property, the Supreme Court has repeatedly held that the government may categorically limit the subject matter of private speech in nonpublic forums, provided the limitation is reasonably related to the forum's purposes and, as with restrictions on unprotected speech, not a cover for suppressing viewpoints with which the government disagrees. *See Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 799-800 (1985) ("Nothing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property[.]"); *see also Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 49 (1983) (holding that the exclusion of communications from one union to potential members while allowing communications from another was not viewpoint discrimination because there was "no indication that the school board *intended* to discourage one viewpoint and advance another" (emphasis added)); *Widmar v. Vincent*, 454 U.S. 263, 280 (1981) ("[T]he university . . . may not allow its agreement or disagreement with the viewpoint of a particular speaker to determine whether access to a forum will be granted.") (Stevens, J., concurring); *Greer v. Spock*, 424 U.S. 828, 838-39 (1976) (concluding a restriction on partisan speech was properly applied because "there is no claim that the military authorities discriminated in any way among candidates for public office based on the candidates' supposed political

views"); *Initiative & Referendum Inst. v. U.S. Postal Serv.*, 685 F.3d 1066, (D.C. Cir. 2012) (A speech restriction in a nonpublic forum is permissible if "reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view."). Government must be able to prospectively set administrable subject-matter-based rules for its nonpublic forums if it is to allow any private speech at all. But because government favoritism in public debate is so pernicious to liberty and democratic decisionmaking, otherwise permissible subject-matter restrictions are rendered unconstitutional when the government chooses sides within the subject matter. *Matal v. Tam*, 137 S. Ct. 1744, 1766 (2017) ("[T]he test for viewpoint discrimination is whether – within the relevant subject category – the government has singled out a subset of messages for disfavor based on the views expressed."); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 112 (2001) ("[S]peech discussing otherwise permissible subjects cannot be excluded from a limited public forum on the ground that the subject is discussed from a religious viewpoint."); *Cornelius*, 473 U.S. at 806 (The government acts unconstitutionally when prohibiting a speaker from expressing "[a] point of view he espouses on an otherwise includable subject.").

Properly understood, the distinction between subject matter and viewpoint is critical to forum doctrine's balance of the practical need to regulate private speech on nonpublic property, on one hand, with maximizing opportunities for speech and vigilance against unbridled administrative discretion, on the other. *See Cornelius*, 473 U.S. at 800. Without reasonable control over the content of private speech in nonpublic forums, government may elect to close a forum entirely rather than deal with the administrative burden or floodgate consequences of accepting private speech without effective subject-matter restrictions. Further, by requiring

government to set prospective, categorical, subject-matter rules by which to evaluate private speech, forum doctrine provides public notice of what speech is permissible and constrains the discretion of government actors to pick favorites on an *ad hoc* basis. *See City of Lakewood*, 486 U.S. at 758 ("Only standards limiting the licensor's discretion will eliminate this danger [of chilling private speech] by adding an element of certainty fatal to self-censorship."); *id.* at 756-57 (collecting cases and explaining that "[a]t the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official or agency . . . may result in censorship").

Guideline 12 fits comfortably within this longstanding doctrinal framework. WMATA prohibits "[a]dvertisements that *promote or oppose* any religion, religious practice or belief." J.A. 209 (emphasis added). Guideline 12 is thus a categorical subject-matter restriction by its own terms: It prohibits any advertisement whatsoever on the subject of religious or anti-religious advocacy, whether favoring or opposing religion in general, or any particular religion, belief, or practice. *Cf. Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 831 (1995) ("By the very terms of [its policy], the University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints."). It does not take sides; it restricts all speech on the topic equally, without discriminating within the defined category. *See Minn. Voter's Alliance v. Mansky*, 138 S. Ct. 1876, 1886 (2018) ("The text of the [ordinance] makes no distinction based on the speaker's political persuasion, so [plaintiff] does not claim that the ban [on 'political' apparel] discriminates on the basis of viewpoint."); *Good News Club*, 533 U.S. at 111-12; *see also R.A.V.*, 505 U.S. at 388 ("When the basis for the content discrimination consists entirely of the very reason the entire

class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists.").

By contrast, the speech restrictions struck down in *Lamb's Chapel*, *Rosenberger*, and *Good News Club* each singled out religious viewpoints that otherwise fell within prospectively defined, permissible subject matter. Stated otherwise, those decisions involved rules that permitted private speakers to discuss categories A, B, and C, but when a speaker sought to discuss C from a pro-religious perspective, they were improperly prohibited from doing so. Applying traditional forum doctrine, the Supreme Court held that these prohibitions unconstitutionally singled out a subset of views *within* the forum's permissible, previously established subject-matter categories. *Good News Club*, 533 U.S. at 109 ("Like the church in *Lamb's Chapel*, the Club seeks to address a subject otherwise permitted under the rule, the teaching of morals and character, from a religious standpoint."). This approach comports with the underlying purposes of forum doctrine: Practicality permits government to restrict content within its nonpublic forums in a prospective, administrable manner, but once the parameters of those restrictions are set, administrators cannot further discriminate against a disfavored view that falls within those predetermined parameters.

Here, the Archdiocese does not challenge the exclusion of speech that otherwise fits within a permissible subject matter category – it challenges the subject-matter category itself. *Cf. Rosenberger*, 515 U.S. at 831 ("[T]he University does not exclude religion as a subject matter but selects for disfavored treatment those student journalistic efforts with religious editorial viewpoints."). The Archdiocese argues that if commercial advertisements mentioning the holiday season are approved, its religious-advocacy advertisements must also be permitted because they share the same holiday-season "subject

matter" and, therefore, any distinction would be based on "viewpoint." Appellant Br. 19-20. But such alleged "viewpoint" discrimination could always be reverse-engineered by comparing a prohibited statement with any permitted statement – real or hypothetical – and finding some kind of subject-matter commonality between the two. This improperly inverts the forum-doctrine analysis, ignoring how the government prospectively defined permissible subject matter for its nonpublic forum in general, and instead focusing on how a stymied *speaker* wants to characterize the relevant "subject matter" in a particular case. Allowing an individual private speaker to retroactively redefine the relevant "subject matter" whenever her speech is restricted, as the Archdiocese would have us do, is not only contrary to how the Supreme Court has structured forum analysis, it would make crafting administrable content categories for nonpublic forums nearly impossible.

At base, the Archdiocese asks us to erase the Supreme Court's critical distinction between permissible subject-matter restrictions and impermissible viewpoint discrimination. However, as the primary opinion notes, the Supreme Court has repeatedly upheld and applied the distinction between subject matter and viewpoint. *See, e.g.*, *Mansky*, 138 S. Ct. at 1885 ("[O]ur decisions have long recognized that the government may impose some content-based restrictions in nonpublic forums[.]"); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2230 (2015) ("Government discrimination among viewpoints – or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker – is a more blatant and egregious form of content discrimination" than subject-matter restrictions. (quotation marks omitted)); *Rosenberger*, 515 U.S. at 830-31 (distinguishing between restricting religious subject matter and religious viewpoints). And for good reason: Forum doctrine's boundary between

permissible subject-matter restrictions and impermissible viewpoint discrimination is a load-bearing wall in the First Amendment's structure. Adopting the Archdiocese's position would topple the careful balance struck by the Supreme Court of allowing government to manage expressive content in nonpublic forums, while cabining its discretion with administrable rules and encouraging it to keep these forums open to private speech.

Further, the lack of a principled limitation of the Archdiocese's rule to religious speech could have sweeping implications for what private expression government may be compelled to allow in nonpublic forums once it allows any at all. *See Matal*, 137 S. Ct. at 1763 (holding, in the context of commercial speech, that the Lanham Act's prohibition on registering offensive or disparaging trademarks constituted unconstitutional viewpoint discrimination analogous to that in a limited public forum); *Heffron v. Int'l Soc. for Krishna Consciousness, Inc.*, 452 U.S. 640, 652 (1981) ("[R]eligious organizations [do not] enjoy rights to communicate . . . superior to those of other organizations having social, political, or other ideological messages to proselytize."). In neither briefing nor at oral argument did the Archdiocese offer a cogent explanation of how such a rule could be restricted to religious speech. After all, *political* speech has frequently been designated as the most highly protected form of First Amendment expression. *See, e.g.*, *Pursuing America's Greatness v. FEC*, 831 F.3d 500, 508 (D.C. Cir. 2016) ("The First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" (quoting *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 734 (2011))). And, in addition to naming the "free exercise of religion" as a fundamental right, the plain text of the First Amendment explicitly protects activities such as petitioning and the press. U.S. Const. amend. I. The Archdiocese's approach of

collapsing subject matter and viewpoint might therefore reclassify the vast majority of what are now considered subject-matter restrictions as unconstitutional viewpoint restrictions, forcing government to choose between opening nonpublic forums to almost any private speech, or to none. Such a result is inimical to the First Amendment. *See Ark. Educ. Television Comm'n v. Forbes*, 52 U.S. 666, 680-81 (1998).

Of course, it is not enough to avoid viewpoint discrimination; a subject-matter restriction must also be reasonable, *i.e.*, "consistent with the government's legitimate interest in maintaining the property for its dedicated use." *Initiative & Referendum Inst.*, 685 F.3d at 1073. The Supreme Court recently provided further guidance on forum doctrine's "reasonableness" prong in *Minnesota Voters Alliance v. Manksy*, which struck down a ban on any "political badge, political button, or other political insignia" in the interior of a polling place as unreasonable in relation to the purposes of the forum. 138 S. Ct. at 1883. "Although there is no requirement of narrow tailoring in a nonpublic forum, the State must be able to articulate some sensible basis for distinguishing what may come in from what must stay out." *Id.* at 1888. The vagueness of the word "political," "combined with haphazard interpretations the State [] provided in official guidance and representations to [the] Court," led the Supreme Court to conclude that the ban did not survive the "forgiving" reasonableness test. *Id.*

As the primary opinion explains, both record evidence and common sense show a "sensible basis" for WMATA's conclusion that prohibiting religious or anti-religious advocacy advertisements avoids risks of vandalism, violence, passenger discomfort, and administrative burdens in a manner that serves the forum's stated purpose of providing "safe, equitable, and reliable transportation services." J.A. 204. Guideline 12 is also

readily distinguishable from the ordinance struck down in *Mansky*. WMATA's prohibition on advertisements that "promote or oppose any religion, religious practice or belief," is narrower and more precise than simply a general ban on "religious" or "political" speech. *See Mansky*, 138 S. Ct. at 1891. Moreover, there is no indication that WMATA has promulgated anything like conflicting or confusing guidance that, "combined with" the vague term "political," rendered the Minnesota ordinance unreasonable. *Id.* at 1889.

Because Guideline 12 readily meets the longstanding doctrinal test for permissible subject-matter restrictions in nonpublic forums, and because the Archdiocese's novel analytical approach would both upend forum doctrine and undermine the First Amendment values that doctrine protects, I concur.